**AMERICAN HOME PRODUCTS CORPORATION, Plaintiff,**

v.

**ABBOTT LABORATORIES, Defendant.**

**No. 81 Civ. 4345.**

United States District Court,
S. D. New York.

Sept. 18, 1981.

Donovan, Leisure, Newton & Irvine, Samuel Murphy, Louis Lustenberger, New York City, for plaintiff.

Patterson, Belknap, Webb & Tyler, Thomas Morrison, Christine Miller, New York City, for defendant.

## OPINION AND ORDER

SOFAER, District Judge.[*]

Plaintiff brought this action under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1976), seeking an injunction against and damages for the publication of much of the defendant's advertising of a product known as Tronolane, which plaintiff alleges is false and misleading. Subsequently, plaintiff moved for a preliminary injunction against three of the assertions contained in defendant's advertising. After a three-day hearing and argument on the motion, this Court has decided to grant a preliminary injunction against the defendant's use of the word "new" in certain contexts and against the defendant's assertion that its product "stops pain immediately."

American Home Products Corporation ("AHP") manufactures Preparation H, a hemorrhoid-pain remedy with an overall market share of approximately two-thirds and a grocery-store market share of more than ninety percent. Abbott Laboratories ("Abbott") recently introduced Tronolane into the hemorrhoid-pain relief market with a heavy advertising campaign designed to make Tronolane a significant competitor of Preparation H. Abbott makes many assertions about Tronolane in its advertising, a great number of which AHP alleged in its complaint to be false or misleading. In its motion for a preliminary injunction, however, AHP sought to prevent Abbott's use only of three statements: (1) that Tronolane "stops hemorrhoid pain immediately" or "stops pain immediately"; (2) that Tronolane is a "new" remedy, formula, medication, or product; and (3) that in a "major consumer preference test," Tronolane was preferred by consumers "by more than 2 to 1."

Three forms of advertising are involved. First, there are labels on Tronolane's packaging. "Stops hemorrhoid pain immediately" appears in bold red letters on the Tronolane box and in black letters large enough to stand out on the Tronolane tube. The box also contains, in smaller black print, the words "fast, penetrating, temporary relief of pain, itching, burning." In addition, one corner of the box contains the word "new" written in large letters. Finally, the message sheet inside the box contains the same "stops hemorrhoid pain immediately" phrase in bold letters, and the text of the insert states that Tronolane provides "fast, penetrating, temporary relief of the pain, itching, and burning of irritated hemorrhoidal tissues."

The second form of advertising at issue is the "Blair" newspaper insert. At the top of the insert, in large block letters, the words "major advance in hemorrhoid medication stops pain immediately" appear. The text of the advertisement says that Tronolane provides "immediate relief" and that Tronolane is a "new hemorrhoid medication from Abbott Laboratories." The text also contains a summary of the results of a consumer preference test; the summary states, among other things, that Tronolane won the test "by more than 2 to 1."

The third form of advertising at issue is a television commercial, of which there are two versions that show different images on the screen but use the same words to accompany the images. The voice in the commercials says: "Think Tronolane. The remarkable new two-step treatment for immediate pain relief." At one point in the commercials, the screen shows the words "for temporary relief," though those words are never spoken. In the middle of the ads, the speaking voice says of Tronolane that "[i]ts greaseless formula penetrates directly to nerve endings to stop pain immediately."

The standard in the Second Circuit for the granting of a preliminary injunction requires the moving party to show, first, that it is being irreparably harmed and, second, either (a) that success on the merits is likely *or* (b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation *and* that the balance of hardships tips decidedly toward the party requesting the preliminary relief. *Crouse-Hinds Co. v. Internorth, Inc.*, 634 F.2d 690, 701 (2d Cir. 1980).

---

[*] Opinion issued August 14, 1981, order issued August 18, 1981.

AHP is likely to suffer irreparable harm while Tronolane continues to use its current advertising. Defendant's own witness, Mr. Fischer, testified that the overall message of the television commercials is, as it was intended to be, that Tronolane is superior to Preparation H. The survey conducted for Abbott to test the television commercials (the "ad-testing survey") overwhelmingly supports this proposition. Another of defendant's witnesses, Mr. Raab, testified that the advertisement was designed, and the phrases involved were selected, to "break through the clutter" of consumer advertising with a "more potent" message than other hemorrhoid-pain remedies are currently using. Mr. Raab also stated frankly that Abbott's aim was to inflict harm, preferably irreparable, in the form of a decrease in Preparation H's market share.

Both Mr. Fischer's testimony and the ad-testing survey indicate that the overall message of the television commercials—Tronolane's superiority to Preparation H—depends heavily on the assertion that Tronolane "stops" pain and to some extent on the assertion that Tronolane is "new." The same message is conveyed by the express statements in the Blair insert about the consumer preference test. Thus, the three statements that AHP challenges all contribute to the message of Tronolane's superiority, and are therefore helping to injure irreparably the reputation of Preparation H.

Harm to reputation, however, is not the only irreparable harm plaintiff is suffering. It is also clear from this record, particularly from the testimony of plaintiff's witness, Mr. Mager, that AHP has already suffered a loss of market share of approximately six percentage points, which represents about six million dollars in annual sales. In addition, the record establishes that plaintiff is likely to continue to suffer economic injury from its smaller, and probably diminishing, market share. The courts have recognized that such injury is irreparable because market share is so difficult to recover. *See* 2 J. McCarthy, *Trademarks and Unfair Competition*, § 30:18, at 344–45 (1973).

Plaintiff alleges that defendant is violating Section 43(a) of the Lanham Act, which makes unlawful any "use in connection with goods . . . [of] any false description or representation, including words or other symbols tending falsely to describe or represent the same."

Several concessions made by the plaintiff at the conclusion of the preliminary-injunction hearing simplify application of this standard. First, plaintiff concedes that, to be entitled to the requested preliminary injunction, it has the burden of demonstrating that at trial it is likely to prove that the challenged statements in defendant's advertising are false or misleading. Second, plaintiff concedes that it has not met its burden of showing the falsity or misleading character of the assertion made in the Blair insert that Tronolane won a consumer preference test by more than two to one.

Because of AHP's second concession, the challenge to Abbott's consumer test claim need not be resolved here. It nevertheless seems appropriate to note that both parties appear to agree on the legal standard that should apply to this challenge. The rule of law that governs advertising of consumer-testing results is uncertain, and it is therefore significant that two merchandisers of the competence and high reputation of the parties here—both of whom have long-range interests in the state of the law that transcend their adversarial interests in this case—have unilaterally reached, at least tentatively, the same conclusion on the appropriate legal standard.

Unlike an advertising claim that inaccurately reports the results of a consumer survey, *see, e. g., Philip Morris Inc. v. Loew's Theatres, Inc.,* 511 F.Supp. 855 (S.D. N.Y.1980); *R. J. Reynolds Tobacco Co. v. Loew's Theatres, Inc.,* 511 F.Supp. 867 (S.D. N.Y.1980), the advertising claim made by Abbott in the newspaper insert is, as the testimony shows without contradiction, an accurate report of the comparative portion of the preference-test results. The question in such a case is whether the accurate report of test results is false or misleading because the test itself, or the part of it from

which the reported results are drawn, is invalid as a technique for measuring consumer preferences.

■ To answer that question would evidently involve difficult inquiries into test design and execution, and would require testimony from experts and reference to literature in such fields as statistics, market research, and psychology. Both parties to this case, as this Court understands them, believe that a court should be cautious in interfering with advertising claims whose truth turns on the validity of consumer tests. A legal standard that permitted enjoining such advertising solely on the basis of a theoretical challenge to test methodology could lead to unpredictable judicial decisions that might severely disrupt the standard practices of the advertising and business communities. The parties here agree that a court should require substantial proof of invalidity before enjoining the advertising of the results of any test that is colorably valid.

The Tronolane consumer test involved in this case is colorably valid. Plaintiff's witness, Mr. Mager, testified that the test's validity was undermined by a well-recognized bias, namely, the bias due to the tendency of consumers to try to please the tester by preferring the test product. Nevertheless, defendant's witness, Mr. Weilbacher, testified as an expert that the consumer preference test was of a standard type in the market research field. Although some market-research literature indicates that the bias referred to by Mr. Mager operates even when consumers are satisfied with their present product, see, e. g., H. Boyd, R. Westfall & S. Stasch, *Marketing Research: Text and Cases* 591 (4th ed. 1977), Mr. Weilbacher testified, without being impeached, that countervailing biases were at work in the consumer test and that there are severe practical limitations on the design and execution of any methodologically preferable test. On this record, Abbott has advanced enough evidence to support a finding that the consumer-test methodology was sufficiently rigorous to withstand a challenge that advertising of its comparative results

is false or misleading as a matter of law, and AHP has failed to undermine that finding.

■ To prevail on the merits, plaintiff must develop specific criticisms of the way the test was carried out. Evidence of tests that are both methodologically superior and practical would be highly relevant; indeed, the presence and strength of such evidence might be critical to the success of the challenge. In this case, perhaps, no valid test may be practicable. In that event, the demonstration of the general impracticability or invalidity of all tests of the particular product at issue would be significant evidence in evaluating the validity of the challenged test.

This approach to consumer-test advertising should not be construed as permitting a competitive advertiser ultimately to escape liability for comparative claims merely because its test methodology was sufficiently rigorous to escape a judgment of methodological invalidity as a matter of law. A plaintiff may well meet its burden of proving a Lanham Act violation by establishing, on the basis of more reliable test results, that the claim was in fact false or misleading. Under this approach to evaluating legal challenges to the accurate advertising of consumer test results, comparative claims are made relatively freely, so as to minimize judicial interference in the advertising and consumer-product markets; but they are made at the advertiser's risk.

■ Unlike the comparative advertising claims, defendant's "new" and "stops pain immediately" claims remain contested after the hearing and argument on the preliminary-injunction motion. To establish a likelihood of success on the merits of its challenges to those two claims, plaintiff must meet the standards for applying the Lanham Act laid down in *American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160 (2d Cir. 1978). According to the Second Circuit, a Lanham Act violation may be proved in two ways. First, the plaintiff may show that the challenged advertising statement is actually false; in that event, consumer reaction to the advertising need

not be examined. Second, the plaintiff may show that, although the challenged statement is ambiguous or literally true, the advertising is nonetheless misleading, in that the message understood by a significant number of consumers is false. *Id.* at 165–66.

American Home Products here places primary reliance on the first method of establishing a violation of the Lanham Act. AHP asserts that it is likely to show at trial that it is just plain false to say that Tronolane is new and that it is equally, and just as plainly, false to say that Tronolane stops pain immediately. AHP also argues that, even assuming some ambiguity in the advertising, evidence in the record establishes a likelihood that at trial it will show that consumers are in fact misled.

With respect to newness, the undisputed evidence is that Tronolane's cream formulation is identical to that of Tronothane, a medication that Abbott has been manufacturing and marketing for more than twenty years. The suppository form of Tronolane, by contrast, is new in the sense that no suppository form of Tronothane, or of any identical medication bearing another name, has ever existed. Nonetheless, Abbott's advertisements do not distinguish the cream and suppository forms in asserting that Tronolane is new as a medication, because the particular formulation has no bearing on the process by which the medication affects the targeted bodily ailment. Contrary to its current advertising, therefore, Tronolane—in whatever formulation—is not new as a medication. Indeed, even for the treatment of hemorrhoids, Tronolane is not new, for Tronothane was used for that purpose. That Tronolane is a new consumer product, that its packaging and name are new, that Tronothane was never advertised on a large scale in the over-the-counter consumer market, that Tronothane was never sold primarily as a hemorrhoid remedy and was used chiefly by physicians in their medical practice—none of these facts alters the uncontroverted evidence that as a medication used for hemorrhoids, Tronolane is not new. Furthermore, for the past several years, there has been sold in the over-

the-counter market a hemorrhoid remedy product, Anusol, that contains the same active ingredient, pramoxine hydrochloride, and works in the same way, as Tronolane. Thus, even the idea of selling a product containing that ingredient specifically for hemorrhoid-pain relief is not new.

Consequently, any advertising that states that Tronolane is new as a medication is false. Thus, plaintiff is likely to show that the Blair insert's use of "new" is false. In the context of an advertisement whose most prominent assertion is that Tronolane is a "major advance in hemorrhoid medication," it is false to represent that Tronolane is a "new hemorrhoid medication from Abbott Laboratories."

The phrase "the remarkable new two-step treatment" in the television commercials is also a false description. Indeed, Tronolane's advertising campaign centers on and stresses the product's different way of working on the human body from that of Preparation H. The "treatment" mentioned in the commercials is not a product but a medical process or procedure, and the product is not "remarkable" to consumers as a "treatment" except insofar as it is a remarkable medical aid. Thus, plaintiff is highly likely to show that the phrase "remarkable new two-step treatment" means new medication, and because the medication is not new, use of the phrase for Tronolane is false.

The use of "new" on the package label, by contrast, seems relatively innocuous when considered in isolation. The word "new" appears on its own in the upper lefthand corner of the box and is, at minimum, ambiguous. No evidence has been introduced that would support a finding that, by itself, "new" on the package conveys the meaning of a new medication or a new treatment. Plaintiff is not likely to show that "new" on the label is false or misleading.

Even assuming that defendant's use of the word "new" to characterize a medication is not facially false but only ambiguous, it nevertheless is true here that plain-

tiff is likely to show that the phrase is misleading to consumers. Defendant argues that few consumers questioned in the ad-testing survey conducted for Abbott placed importance on the newness aspect of the television message, though one person did state that the product's newness was its main idea. *See* Defendant's Exhibit AA at 1139. Defendant's argument is unconvincing, however, because the evidence shows that the part of the survey that sought responses without prompting by specific questions (the "unaided-response" part) was designed to elicit the most important message or messages communicated by the advertisement. The testimony shows that consumers cannot, without prompting by specific questions, respond to more than one or two ideas as the most important conveyed by a commercial. Thus, ideas other than those identified as the most important are likely to be perceived and to be given weight by consumers. That such a result occurred here is established by the aided-response portion of the survey—in particular, by the questions touching indirectly on newness. No question asked directly about newness; yet, in connection with a question asking whether the defendant's product would live up to its claim that it would stop pain immediately, several respondents stated that they believed the claim because the product was new. Because the question goes directly to the efficacy of the product, the responses indicate that at least those consumers were misled to believe that the product is new as a medication or treatment, not merely as an item newly advertised and sold in the marketplace.

Plaintiff's argument that it is false to describe Tronolane as "new" even when that description means that Tronolane is a new product, as opposed to a new treatment or medication, cannot be accepted on the basis of this record. The plaintiff is unlikely to succeed on that issue. Mr. Raab credibly testified that the word "new" is widely used in the marketplace in connection with a wide variety of products to refer to a marketing effort, to packaging, to the product's name, and to many other aspects of merchandise that can tenably be called new.

Plaintiff is not likely to show that the use of the phrase in this sense is false.

Plaintiff is also unlikely to succeed in showing that the description of Tronolane as a "new" product is misleading. There is no evidence in the results of the ad-testing survey that consumers are misled by this representation. Tronolane *is* a new product—a new commercial venture, a new merchandising effort—and consumers attach no particular significance to that fact. No reactions in the survey were based on the newness of Tronolane as a product. What reactions there were to Tronolane's newness related only to the newness of the product as a medication. Thus, consumers were misled about the more significant message that could be conveyed by the word "new" and disregarded the relatively insignificant message that Tronolane is a new product, a message that is inconsequentially misleading if it is misleading at all.

It would be a severe and unwarranted interference to conclude, on the basis of so skimpy a record, that being a new merchandising venture is insufficient to justify use of the word "new" to characterize Tronolane as a new product. On the basis of the quite convincing testimony at the hearing about the present state of merchandising and advertising, to prohibit use of the word "new" in connection with a new product that is newly merchandised through new channels (including supermarkets) could disrupt practices based on widely accepted norms.

The most difficult issue in this case is whether the statement that Tronolane "stops pain immediately" is false or misleading. Abbott's clinical tests establish that Tronolane is perceived by users to act on and to reduce pain over time, that Tronolane completely ends perceived pain in some people almost at once, that as time passes more people experience the complete cessation of perceived pain (as many as twenty-five percent within a few minutes), but that after two or even five hours many Tronolane users continue to experience a significant proportion of the pain they felt when they first used Tronolane. Tronolane

does not produce complete or virtually complete cessation of pain in any more than approximately fifty percent of all users over an extended period of time. *See* Plaintiff's Exhibits at 27–30. If the phrase "stops pain immediately" means on its face that such total cessation of perceived pain is achieved, then use of the phrase by Abbott is a false description.

Although the question is difficult, the record establishes that plaintiff is likely to establish that "stops pain immediately" does unambiguously have that meaning in this particular context and is therefore false. Moreover, even assuming that the phrase is ambiguous, the defendant's consumer surveys tend strongly to establish that the statement that Tronolane "stops pain immediately" is understood, and intended, to constitute a claim that all pain is stopped very soon, even though most consumers appear to discount or disregard this intended meaning. Plaintiff is therefore likely to show that Abbott's use of the phrase is misleading.

The determination that "stops pain immediately" is a false description when used in this context is based on the meaning of the words, the context in which the words are used, both grammatical and commercial, and the intent with which the words are being used by this defendant.

The word "stop," as a verb, has many dictionary definitions. Though most are irrelevant to this proceeding, some meanings apply to pain, but only if pain is considered as a process; the evidence in the record is that pain is felt when nerve endings send signals to the brain as a result of a potassium/sodium exchange in the nerve-ending cells, and that an anesthetic, such as pramoxine hydrochloride, works by stabilizing the exchange. With respect to pain, then, the only relevant definition of "stop" is "to cause to cease, put an end to," to quote from the *Oxford English Dictionary*. 10 *The Oxford English Dictionary* 1025–30 (1933). No definition in that dictionary or in *Webster's Third New International* — to cite only two examples of relatively inclusive dictionaries — gives "partially ceased" or "partially reduced" or anything synonymous to those phrases as a definition for "stop." *See id.; Webster's Third New International Dictionary* 2250–51 (1976). Of course, dictionaries are not conclusive, but they do indicate, when used to aid a speaker's knowledge of common meanings, that plaintiff is likely to show that "stop" does not mean merely reduce or diminish or ease or alleviate. Further, although some deceptive advertising cases have examined whether "stops" must mean stops permanently or can mean stops temporarily, no case has been referred to the Court in which a claim was made (let alone successfully made) that "stops" means partially stops. *See, e. g., Carter Products v. FTC*, 186 F.2d 821 (7th Cir. 1951); *Sebrone Co. v. FTC*, 135 F.2d 676 (7th Cir. 1943); *D. D. D. Corp. v. FTC*, 125 F.2d 679 (7th Cir. 1942).

Similarly, plaintiff is highly likely to show that "immediately" unambiguously means right away or at once—understood, of course, in the relevant context. Abbott relied for its understanding of "immediate" on the guidance provided by the FDA drug panel report on anorectal drugs. *See* 45 Fed.Reg. 35576 (1980). That report says that "immediate" means within twenty minutes, and no evidence in the record indicates that anyone understands the word any differently. In the relevant context, therefore, "immediately" unambiguously means some interval up to approximately twenty minutes. By defendant's admission, in no event could "immediate" encompass a period of two or (especially) five hours, and no testimony given at the hearing suggests that possibility. Putting the words "stop" and "immediate" together, therefore, the phrase "stops pain immediately," plaintiff is likely to show, cannot mean merely reduces pain over two or five hours.

· Defendant seeks to undermine this conclusion by observing, correctly, that context determines the meaning of words. Defendant contends, without apparent embarrassment, that "stops," in the context of its advertising, does not mean stops; rather, "stops pain" can and should be read to mean stops some pain or some significant

amount of pain. Defendant reasons, in support of this contention, that pain cannot ever be entirely stopped, and on the record developed in this case, it is apparently true as a scientific matter that hemorrhoid pain cannot be stopped completely. Therefore, as used in conjunction with "pain," the word "stops" cannot be understood, defendant asserts, in the way it is understood when used in reference to a policeman's stopping a car or Muhammad Ali's stopping George Foreman.

Yet, as defendant's own clinical studies reflect, it is not the entire cessation of pain, as medicine would recognize it, that is relevant in this case. Defendant's advertisements are concerned with the user's perception of pain, and the uncontroverted evidence shows that many users perceive an elimination of pain, an entire cessation of pain. The relevant criterion for determining falsity, therefore, is whether the phrase "stops pain immediately" falsely conveys the meaning "stops the perception of all significant pain very promptly," not whether use of the phrase constituted a promise to end all pain in the scientific sense.

In its everyday sense, then, pain can indeed be stopped: it can be caused to cease or terminate. In fact, defendant has itself proceeded on the basis of this understanding by seeking in its clinical examinations data about perceived pain. It is entirely reasonable, therefore, to attribute to defendant an intent to communicate the notion of causing pain to cease.

That "stops" in fact was intended to and does convey its only relevant dictionary meaning, i. e., to cause to cease or end, is further supported by consideration of the grammatical context of the phrase "stops pain immediately" viewed as a whole. Taken as a unit, "stops pain immediately" has a distinctive boldness, not only with respect to the onset of relief, but also with respect to the extent of relief in any one person and the scope of relief in the population at large. Even if some consumers might reasonably perceive "stops pain," when used by itself in an advertisement, to mean something akin to relieves pain or reduces pain-

fulness or the feeling of pain, addition of the word "immediately" strengthens the message. A product that is able to "stop" pain "immediately" is clearly understood to be one that is capable of ending pain, at least in a relatively short time. The message that something—here, pain—is immediately stopped is one that unambiguously makes use of the ordinary meaning of "stop," that is, to end or cause to cease.

The commercial context, like the grammatical, helps define the meaning of the phrase at issue. "Stops pain immediately" is a strikingly strong and extraordinary assertion in the hemorrhoid remedy market. No other product for hemorrhoid-pain relief makes as strong a claim for itself. All of Tronolane's competitors restrict their self-characterizations to "relieves pain" or the like. None purports to "stop" pain. All use the word "relief," as recommended by the same FDA panel report that defendant's witness Mr. Raab chose to rely on in another context. The word "relief" has been uniformly and repeatedly used in this particular market to mean reduce or ease. The word "stop" has not been used at all.

That no other product that only "relieves" or "reduces" pain purports to "stop" pain is probative of the meaning of "stop" and of the entire phrase at issue as it is used by the defendant. Defendant's product differs from Preparation H in that it contains pramoxine hydrochloride. But Anusol contains the same active ingredient as Tronolane and claims only to relieve pain. Furthermore, Abbott's own clinical data establish that Preparation H, like Tronolane, reduces pain, even though it contains no anesthetic. Yet Preparation H claims only to relieve pain.

Other products, such as Solarcaine, Campho-Phenique, and Denorex (an AHP product), make bold assertions about "stopping" pain or itch. The verbal context of these assertions, however, differs from that of Tronolane's claim in that they do not include the strengthening qualifier "immediately," and therefore do not on their face mean something quite as definite and strong as "stops pain immediately." More-

over, because the commercial contexts, the markets, in which those phrases are used differ from the anorectal drug market, different meanings may be conveyed and understood. Most important, though, even if the assertions on behalf of other products mean something every bit as strong as the Tronolane phrase, the claims may in fact be true. Defendant has failed to establish the falsity of the advertising claim, for example, that Denorex "stops" dandruff itch. That product may in fact entirely end the perceived need to scratch, when used as directed, for substantially all users, even if only for a short time. The same may be true of the other unqualified uses of "stops" by nonhemorrhoidal products. In short, without judicial testing of the other advertising assertions, they are not helpful in determining the meaning of the phrase challenged here.

At this point, therefore, defendant has not established any significant use of "stops" to mean "relieves," even in connection with consumer products in other markets. On this record, the advertising claim that Tronolane "stops hemorrhoid pain immediately" means something so much stronger than "stops" in some people, "reduces" pain immediately, or "eases" in most cases over time that its use by Tronolane, plaintiff is likely to show, is an unambiguously false description. This conclusion is not undermined by the existence of ambiguities in the words here at issue. Concededly, "immediate" may mean one second, three minutes, or twenty minutes, and use of "stops" may be justified by clinical studies showing a ninety percent cessation of pain in users or may require ninety-five percent. Nonetheless, the two to five hours during which Tronolane works and the significant amount of pain it never causes to cease are not encompassed by any ambiguity in the challenged phrase.

The final consideration that supports the conclusion that plaintiff is likely to show that "stops pain immediately" is unambiguously false is the defendant's intent in using that phrase. Messrs. Raab and Fischer made clear that they consciously chose both "stops" and "immediately" in order to break through the clutter of other advertising messages in the area—to say something different, something more potent, than the commonly stated, indeed uniformly stated, "relieves pain." What was intended to be conveyed that is more than relief and less than a cessation of pain? It seems clear that no intermediate message could have been conveyed by "stops," and that in using the phrase in a market in which the word "stops" necessarily meant something different from "relieves," Abbott intended to use "stops" to mean something more; in brief, it is clear that Abbott intended to use "stops" in its plain dictionary meaning of ends or causes to cease. Because of Abbott's intention, and for all the other reasons described, AHP is likely to show that it is unambiguously false to say that Tronolane "stops pain immediately."

Even if a relevant ambiguity is present in the phrase at issue, plaintiff's position is nevertheless likely to prevail. There is considerable evidence in the record of what consumers understand to be the message of the Tronolane television commercials. That evidence comes from the ad-testing surveys conducted for Abbott, surveys that were of the same type as those relied on in *American Home Products Corp. v. Johnson & Johnson, supra,* 577 F.2d at 167–69, to support a finding of false advertising.

Defendant asserts through its witness Mr. Fischer that consumers understand "stops" to mean "relieves." In fact, in the unaided response portion of the survey, consumers responded that the main idea communicated was relief. Respondents repeatedly used the words "relief" or "relieves" in their answers.

Nevertheless, some consumers did use the word "stops." More important, the unaided-response portion of the survey shows only the most important message received. Use of the word "relief" in that context is entirely consistent with the consumer perception that the word "stops" means ceases or ends. Indeed, it is more than consistent; it is perfectly understandable in light of consumer skepticism about advertising

claims and consumer capacity to accommodate to exaggeration.

Far more significant in determining whether consumers understand "stops" to mean stops in the dictionary sense are the responses to the survey's specific question asking whether the product would live up to its claim that it would stop pain immediately. Asking the question itself reflects an understanding on Abbott's part that the word "stops" means more than the word "relieves;" otherwise, there would be no claim that was notable in the hemorrhoid-remedy market to be lived up to. Beyond that, however, many consumers responding to the question indicated that they did understand the phrase "stops pain immediately" to mean ceases or ends. These included some of the consumers who responded that they thought Abbott would live up to its claim. That several of these consumers said they believed that Abbott would live up to its claim because truth in advertising laws would ensure that Abbott advertise properly is evidence that they took the claim to be a serious and dramatic one, rather than the usual, virtually hackneyed claim (as Mr. Raab thought of it) that pain is merely relieved. The same is true of consumers who regarded the claim as true because it was so convincing. The belief of these consumers that the claim would be lived up to is some evidence that they thought the claim extended to ending pain. The several consumers who said that they believed the claim because the product was new are the best evidence: their responses most clearly suggest an understanding that the claim itself was new, different from merely "relieves," and not only in degree.

The consumer evidence implicit in the responses of those who said they felt that Abbott would not live up to its claim is even more probative. Among these individuals, many—we cannot know exactly how many, but certainly more than a mere handful—indicated that no product could stop pain immediately. They too took the claim to be dramatically different from earlier claims; they simply disbelieved it. The many people who disbelieved the advertising may well be among those who said that the main message conveyed was that the product would relieve pain; they may have used the word "relieved" because they did not believe that pain would be stopped immediately.

Of course, consumer disbelief in the claim "stops pain immediately" may reduce the injury caused by the advertisements. But skepticism, or whatever is at work, does not affect the meaning itself or the fact that the meaning was conveyed. Indeed, disbelief is expressed by these consumers only because they understood the word "stop" to mean end or cause to cease. Even if consumer reaction were consulted, therefore, plaintiff seems likely, on the present record, to prove that a substantial number of consumers are likely being misled by the Tronolane claim to stop pain immediately, in that they understand it to mean that Tronolane ends all perceived pain immediately or quickly.

In conclusion, AHP has shown that it is likely to demonstrate at trial that Abbott's use of "stops pain immediately" in connection with Tronolane, and Abbott's use of "new" in the ways indicated, are either false or misleading. A preliminary injunction may therefore issue under the likelihood-of-success branch of the preliminary injunction test. Plaintiff is entitled to a preliminary injunction under the second branch of that test as well. At the very least, plaintiff has raised significantly serious questions going to the merits with respect to those statements found likely to be proven false or misleading. Therefore, the balance of hardships must be examined to determine whether, independent of plaintiff's having established a likelihood of success on the merits, a preliminary injunction would be appropriate because plaintiff has raised serious questions going to the merits and the balance of hardships tips decidedly in its favor.

On the present record, one cannot say as an abstract proposition that the balance of hardships tips decidedly in plaintiff's favor. On plaintiff's side of the balance there is the amply evidenced loss of business to

Preparation H that Tronolane's advertising campaign has begun to and probably will continue to cause. There is also the damage to Preparation H's reputation as a product, and there may be a special loss to a manufacturer whose product overwhelmingly dominates a market when the first substantial incursion is made into that market.

On the defendant's side is loss of potential business in the hemorrhoid-remedy market and a loss of momentum in launching a new product. There is also the cost of changing the advertising, which varies according to the form of the advertising. And there may be special hardships that no court can fully comprehend in altering an advertising campaign early in the marketing of a product. The reputation of Abbott may be so affected, as Mr. Raab pointedly stated, that it would be harmed not only in its marketing of this particular product, but in its plans to enter the consumer product market generally. In addition, equitable considerations based on timeliness are at work here. Plaintiff knew of the nature of the defendant's claims as early as April 1981. Plaintiff correctly asserts that until July, or June 1 at the earliest, it did not know the details of the advertising that the defendant intended to use. Nevertheless, it is clear that the plaintiff could, and should, have protested the defendant's claims earlier than it did, before defendant made its full advertising investment.

The issue of hardships, however, cannot always be perceived in a meaningful way in the abstract. In this particular context, the balance of hardships will tilt one way or the other according to the remedy chosen. Some remedies would work a grave hardship to the defendant; others would cause only minimal inconvenience. By contrast, persistent hardships are being suffered by the plaintiff; indeed, this is a clear case of possible irreparable injury. Consequently, it is appropriate to impose on defendant, with respect to those questions that present a serious basis for further litigation, those remedies that cause so little hardship as to leave the scales tipped decidedly in the plaintiff's favor.

In general, there are three areas in which remedies are appropriate under this standard. The Blair insert, which is to run in newspapers in two days, is too late to stop, as everyone concedes. So no remedy is ordered at this time with respect to the Blair insert. As for other, future print advertising, however, it is appropriate at this time to enjoin preliminarily the defendant from engaging in any further print advertising inconsistent with the findings and conclusions of this opinion. That order is stated with greater particularity in the order that accompanies this opinion.

The second area in which a remedy is appropriate—the most important area for the plaintiff—is the television advertising. The uncontroverted testimony is that the television commercials can be changed cheaply, quickly, and easily. The changes that are necessary to comply with this opinion appear not likely to have any of the severe consequences for the defendant's legitimate commercial interest identified in analyzing the balance of hardships in the abstract. The only two changes necessary at this time are the elimination of the word "new" in the phrase "remarkable new two-step treatment" and the modification of the phrase "stops pain immediately" in such a way as to convey a truthful message.

It may be useful guidance for the parties to indicate that the phrase "reduces pain immediately" does not seem to present the problems presented by the phrase currently being used. The substance at issue, the record shows, acts so quickly in the perception of consumers that the word "immediately" in conjunction with any word that indicates a gradually decreasing perception of pain would be facially truthful and not likely to mislead. Because the defendant remains free to broadcast television commercials that communicate this message, which is perhaps somewhat less potent but is undoubtedly far more accurate, the restriction should interfere minimally with the defendant's legitimate interests in attempting to obtain increased sales.

Finally, the third area of advertising in which changes are appropriate is packaging. In this connection, it is important that the boxes and tubes contain qualifying language reciting that Tronolane "relieves" pain temporarily. That language also appears on the screen in the television commercials, and even there eliminates the need for more stringent remedial action. When used on the boxes and tubes, that language seems especially likely to minimize the improper impact of the claim that Tronolane "stops pain immediately." This is not to say that the claim has no improper impact. The claim is still likely to have an adverse effect on the plaintiff, and improperly so. Nevertheless, it is significant that even plaintiff does not seek to have the boxes and tubes removed from the supermarket and drugstore shelves of America.

On the record so far developed, no order should be entered with respect to boxes and tubes that have been prepared for sale by the defendant or printed and prepared for boxing or packaging. It may be that plaintiff, through further discovery, will be able to show that defendant should be forced to discard some relatively small quantity of boxes or tubes that it possesses but has not yet used. At this time, however, given the equities present and the relatively limited impact of the advertising on those boxes and tubes, and on the inserts in the boxes, no such order should issue. On the other hand, the order should apply to new boxes and tubes, material that the defendant has not yet contracted for in such a way as to be bound to a particular label content. Therefore, defendant is preliminarily enjoined to arrange, in all future transactions with its suppliers, for boxes, tubes, and inserts that do not contain any of the expressions found preliminarily to be impermissible. The accompanying order sets forth the injunction with greater particularity.

## PRELIMINARY INJUNCTION ORDER

The plaintiff having submitted its amended motion for a preliminary injunction, dated August 7, 1981; and the Court having considered the verified amended complaint, dated August 7, 1981, the affidavits and annexed exhibits submitted in support of the amended motion and in support of the plaintiff's original motion for a preliminary injunction, dated July 13, 1981, the defendant's answer to the original verified complaint, dated July 31, 1981, and the testimony and documentary evidence submitted at the hearing on the amended motion held before this Court on August 11 through 13, 1981; and the plaintiff having suffered and being likely to continue to suffer irreparable injury to the market share and reputation of its product Preparation H because of the defendant's advertising of its product Tronolane; and the plaintiff having demonstrated a likelihood of success on the merits of its claim that in certain particulars the defendant's advertising of its hemorrhoidal product Tronolane is false and misleading in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1976); and a plaintiff having shown that there are serious questions on the merits of its Lanham Act claim and that the balance of equities tips decidedly in its favor for the remedies ordered below; and the Court having stated its findings of fact and conclusions of law in its memorandum decision on August 14, 1981; it is hereby

ORDERED, that the defendant Abbott Laboratories, its officers, agents, servants, employees, and attorneys, and all persons in concert with any of them, be enjoined, pending a final determination in this action, from broadcasting, publicly printing, publishing, displaying, or otherwise publicly disseminating or advertising, or causing to be so disseminated or advertised, any representation, either express or implied, that Tronolane

(i) "stops pain immediately," "stops hemorrhoid pain immediately," or otherwise causes an immediate and complete cessation of pain in substantially all users; or

(ii) is a "new two-step treatment," "new medication," or "major medical advance," or is otherwise a medication that affects hemorrhoid pain through a proc-

ess not previously available from other products;

and it is

FURTHER ORDERED, that nothing in this order shall be construed to prohibit the defendant from distributing, selling, or offering for sale any Tronolane tubes or suppositories, together with their packaging and inserts, that were in retail stores, or that the defendant had in inventory or in the process of production, or that the defendant had contracted for in such a way that the labeling on Tronolane units could not be altered, on August 14, 1981; and it is

FURTHER ORDERED, that the defendant's current television advertising be modified to conform to this order no later than 11:00 a. m. of August 22, 1981, but that until such date, the defendant may continue to broadcast its current advertising; and it is

FURTHER ORDERED, that the plaintiff post a bond issued by an approved corporate surety in the amount of $5,000 to secure such costs and damages as may, in the event it is determined that this restraint on the defendant is unlawful, be found to have been incurred by the defendant as a result of this order.