NOVARTIS CONSUMER HEALTH, INC., Plaintiff,

v.

JOHNSON & JOHNSON–MERCK CONSUMER PHARMACEU-TICALS CO., Defendant.

No. CIV. 00–5361(WGB).

United States District Court, D. New Jersey.

Dec. 22, 2000.

Bruce P. Keller, David H. Bernstein, Michael R. Potenza, Debevoise & Plimpton, New York, NY, Joseph Hayden, Jr., Decotiis, Fitzpatrick, Gluck, Hayden & Cole, LLP, Teaneck, NJ, for Plaintiff.

Steven A. Zalesin, Joshua A. Goldberg, Patterson, Belknap, Webb & Tyler LLP, New York, NY, Francis X. Dee, Carpenter, Bennett & Morrissey, Newark, NJ, for Defendant.

## OPINION

BASSLER, District Judge.

Plaintiff Novartis Consumer Health, Inc. ("Novartis") and Defendant Johnson & Johnson–Merck Consumer Pharmaceuticals Co. ("J & J") are fierce competitors in the over-the-counter antacid industry. Novartis seeks what it normally promises to provide—fast and effective relief; Novartis moves [1] pursuant to Fed.R.Civ.P. 65 for a preliminary injunction to prevent J & J from using the designation "Night Time Strength" on the new addition to its line of Mylanta antacid products. For the following reasons, Novartis's motion for preliminary injunctive relief is **granted.**

This Opinion contains the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

## I. BACKGROUND

### A. Procedural History

On October 31, 2000, Novartis filed a complaint against J & J alleging that, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8–1, et seq.,[2] J & J's advertisements regarding Mylanta Night Time Strength ("MNTS") and the name of the product itself are false and misleading. After filing suit, on December 8, 2000, Novartis filed this motion for preliminary injunction in accordance with Appendix N of the New Jersey Federal Practice Rules ("Local

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

2. Because Novartis has not briefed its request for relief under the New Jersey Consumer Fraud Act and J & J has failed entirely to address that request, the Court declines to undertake a New Jersey Consumer Fraud Act analysis.

Rules"). Neither party requested that discovery or an evidentiary hearing [3] be conducted prior to the Court ruling on this motion. The Court heard oral argument on Novartis's motion on December 18 and 19, 2000.

## B. *Antacids Generally*

The parties produce over-the-counter ("OTC") drugs that treat heartburn. Novartis produces and markets the Maalox brand of antacids while J & J produces and markets the Mylanta brand. To understand Novartis's objections to the labeling, packaging, and advertising of J & J's new antacid, some brief background on heartburn and how antacids function is helpful.

Heartburn is caused by stomach acid that backs up, or "refluxes," into the esophagus. Acid reflux and heartburn are most likely to occur shortly after a meal, when the stomach produces a high volume of acid to begin the digestion process, and during the night. Heartburn occurs more frequently at night because acid more easily refluxes into the esophagus when a person is lying down; moreover, during sleep, the body naturally secretes acid, thereby raising stomach pH. A May 2000 study conducted by the Gallup Organization for the American Gastroenterological Association revealed that nearly eight out of ten heartburn sufferers (79%) experience symptoms at night and that seven out of ten (70%) claim that night time discomfort is either "severe" (42%) or "moderate" (28%). (*See* Gallup Organization study, "Understanding Heartburn in America," attached as Ex. J to Gleber Decl.) Because millions of Americans suffer from heartburn at night and as a result experience disrupted sleep patterns, the producers of OTC heartburn remedies vigorously compete to capture sales among night time heartburn sufferers.

The market for OTC drug products offers three types of heartburn remedies. Unlike stomach acid blockers [4] or rafting agents,[5] antacids work by quickly neutralizing excess acid already present in the stomach. While antacids provide fast relief, the disadvantage is that the effects wear off within 30–60 minutes as the antacid has no effect on the production of new stomach acid. Therefore, if additional stomach acid is produced, another dose of antacid must be ingested.

---

3. Novartis relies on the following declarations and attached exhibits:

    (1) Declaration and Supplemental Declaration of Dr. Gerald L. Ford ("Ford Decl." and "Ford Supp'l Decl.");

    (2) Declaration of Donald O. Castell, M.D. ("Castell Decl.");

    (3) Declaration of Jill Lewis ("Lewis Decl.");

    (4) Declaration of Rick Gleber ("Gleber Decl.");

    (5) Declaration of Helmut Albrecht, M.D. ("Albrecht Decl.");

    (6) Declaration of Michael Potenza ("Potenza Decl.");

    (7) Certification of Joseph A. Hayden, Jr. ("Hayden Decl.").

J & J relies on the following declarations and attached exhibits:

    (1) Declaration of Thomas D. Dupont, Ph.D. ("Dupont Decl.");

    (2) Declaration of Scott Korn, M.D. ("Korn Decl.");

    (3) Declaration of Peter Miller ("Miller Decl.").

Additionally, on December 15th, J & J submitted the Supplemental Declaration of Peter Miller. Because the Miller Supplemental Declaration is an improper sur-reply and was submitted on the Friday before the argument scheduled for the upcoming Monday, the Court will not consider either the Supplemental Declaration or Novartis' response to that additional submission.

4. Stomach acid blockers (histamine–2 receptor antagonists), such as Pepcid AD and Zantac 75, treat heartburn by reducing the production of stomach acid for approximately 8–12 hours. While they control acid for a longer duration than antacids, they do not work as quickly because they do not neutralize acid already present in the stomach.

5. Rather than neutralizing acid, rafting agents, such as Gaviscon, form a foam layer on top of the stomach contents so that when reflux occurs, the foam backs up into the esophagus instead of the acidic gastric contents. The foam barrier lasts for about 3–4 hours. (Albrecht Decl., at ¶ 7.)

The "strength" of an antacid is measured by the product's ability to neutralize acid in a beaker over a 15 minute period (in vitro). This acid neutralization capacity ("ANC") does not, however, represent an antacid's effectiveness in the human body (in vivo) or its ability to relieve the symptoms of acid reflux. In the human body, other factors such as rate of gastric emptying, the stomach's rate of secretion of acid, and the degree to which the antacid mixes with gastric contents all bear on the antacid's efficacy. *See Johnson & Johnson–Merck Consumer Pharmaceuticals Co. v. Rhone–Poulenc Rorer Pharmaceuticals, Inc.*, 19 F.3d 125, 127 (3d Cir. 1994) (*"Rorer"*). Concluding that the public would confuse the ANC as a measure of effectiveness, the FDA, excluded such information from product labels. *Id.*

## C.  *Facts*

In March 2000, J & J announced the introduction of its new product Mylanta Night Time Strength ("MNTS"), which it then began shipping in June. MNTS has more active ingredient per teaspoon than other antacids. Its ANC rating is roughly 7% higher than "Maximum Strength" Maalox. MNTS has 500 milligrams of each of aluminum hydroxide and magnesium hydroxide while Maximum Strength Maalox has 500 milligrams of aluminum hydroxide and 450 milligrams of magnesium hydroxide. MNTS's ANC rating is also higher than all other antacid products. (Albrecht Decl., at ¶ 11.)

In August 2000, J & J launched a national advertising campaign in support of MNTS. In nationally disseminated television commercials, J & J claimed that MNTS was "made just for" night time heartburn, that it was "the strongest antacid you can get," and that it was "something strong enough to get rid of even your toughest nighttime heartburn." The announcer then stated, "go ahead, enjoy your night," while the words "New Mylanta Nighttime" [sic] appear on the screen. The disclaimer "does not contain sleep aid" also briefly appeared on the screen, allegedly in letters that were minuscule relative to size of the "The Strongest Antacid."

Novartis asserts that J & J disseminated false claims regarding MNTS in other promotional materials as well. For example, on or about August 20, 2000, J & J published a "free standing insert" print advertisement in Sunday newspapers nationwide touting MNTS as the "solution for heartburn at its worst" and as having been "specially formulated for Night Time heartburn." In tiny letters, the lower left-corner of the advertisement stated "[d]oes not contain a sleep aid." (Gleber Decl., at ¶ 10, Ex. E.) Further, J & J's website purportedly boasted that MNTS "is the **first** and **only** antacid formulated specially to relieve your toughest Night Time heartburn" and promised that the product would deliver a restful night's sleep, because "[y]ou may know you have to be up early the next day, but your stomach doesn't." (Gleber Decl., at ¶ 9.)

Shortly after the national advertising campaign commenced, Novartis expressed its objections to J & J over MNTS's name and advertising claims and also challenged J & J's television commercial before the three major networks. In response to the network challenges, J & J decided to revise its television commercial and web site to eliminate many of the disputed claims and advised Novartis and the television networks in early October of its impending revisions. (Miller Decl., at ¶¶ 28–29.) The current television commercial for MNTS pictures a woman sitting down on a couch after dinner. The announcer states, "what a time for really tough heartburn. Good thing there's something just as tough." MNTS is then described as, "the strongest antacid you can get," and that it is "made strong to work on even tough nighttime heartburn … fast." As the commercial closes, the woman has her eyes closed and her head tilted back on the sofa.

The new website states, "Do you experience your heartburn at night? 76% of heartburn sufferers say they do. If you

do, here is great news for you! Introducing MYLANTA® Nighttime [sic] Strength. MYLANTA® Nighttime [sic] Strength begins neutralizing acid on contact. In fact, no other antacid is faster or stronger. And MYLANTA® does not contain a sleep aid so you can sleep naturally at night. MYLANTA® NightTime Strength works on even your tough nighttime heartburn."

Although J & J argues that Novartis's motion, filed in November, addresses only the original discontinued ads, Novartis maintains that any edited advertising that still features the product name cannot cure what amounts to consumer fraud.

## II. DISCUSSION

### A. Standard for Preliminary Injunction

██ Whether or not a court should grant a preliminary injunction is committed to the sound discretion of the trial court. *Penn Galvanizing Co. v. Lukens Steel Co.*, 468 F.2d 1021, 1023 (3d Cir. 1972). But a court must always be mindful that an injunction is "an extraordinary remedy which should be granted only in limited circumstances." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir.1989).

██ In exercising its decision, the court must be convinced that all four of the following factors favor preliminary relief: (1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer "irreparable harm" without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest. *Clean Ocean Action v. York*, 57 F.3d 328, 331 (3d Cir.1995); *American Tel. & Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1426 (3d Cir. 1994).

### B. Likelihood of Success on the Merits

### 1. Standard for False Advertising Under Lanham Act

Section 43(a) of the Lanham Act, as amended in 1988 and 1992, prohibits false advertising in interstate commerce. It provides in pertinent part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which

.     .     .     .     .

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

██ The plaintiff bears the burden of proving by a preponderance of the evidence: "1) that the defendant has made false or misleading statements as to his own product (or another's); 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and (5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc." *Rorer*, 19 F.3d at 129 (citations omitted). A plaintiff "bears the burden of showing that a challenged advertisement is false or misleading, not merely that it is unsubstantiated by acceptable tests or other proof." *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.*, 902 F.2d 222, 228 (3d Cir.1990).

If a plaintiff proves that the challenged claims are literally false,[6] the court need not consider whether the buying public was misled before granting relief. *Rorer*, 19 F.3d at 129. "When the advertising claim is false, the court may grant relief on its own findings that the advertisements have a 'tendency to deceive.'" *W.L. Gore & Assocs., Inc. v. Totes Inc.*, 788 F.Supp. 800, 805 (D.Del.1992) (citing *Stiffel Co. v. Westwood Lighting Group*, 658 F.Supp. 1103, 1111 (D.N.J.1987)). In assessing whether a claim is literally false, "a court must analyze the message conveyed in full context." *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 946 (3d Cir.1993); *Cuisinarts, Inc. v. Robot–Coupe Int.'l Corp.*, 1982 WL 121559, at *2 (S.D.N.Y. June 9, 1982) ("[I]n determining facial falsity the court must view the face of the statement in its entirety, rather than examining the eyes, nose, and mouth separately and in isolation from each other.") Therefore, a court may grant relief not only when a false claim is literally stated *in haec verba*,[7] but also when claims are false by necessary implication. *See id.* at 946–47; *Tambrands, Inc. v. Warner–Lambert Co.*, 673 F.Supp. 1190, 1193–94 (S.D.N.Y.1987) (noting that representations made by "necessary implication" can constitute false and misleading advertising). When an advertisement conveys a meaning that is unambiguous, a court need not consider whether the buying public was actually misled; conversely, where an advertisement is ambiguous, a court must look to consumer reaction. *Castrol Inc.*, 987 F.2d at 947 (citing *Cuisinarts*, 1982 WL 121559, at *2).

If, however, the challenged advertisements are not literally false, the plaintiff must prove by a preponderance of the evidence, that the claim is deceptive or misleading, which typically is proven through a consumer survey. *Sandoz*, 902 F.2d at 228–29; *Rorer*, 19 F.3d at 129–30. The plaintiff must show how consumers *actually* react, rather than how consumers *could* react. *Sandoz*, 902 F.2d at 229.

### 2. Analysis

Here, Novartis maintains that the MNTS name, packaging and advertising includes, either explicitly or implicitly, four false claims:

(1) MNTS contains a sleep aid or other ingredient that causes drowsiness;

(2) MNTS is "specially formulated" for night time heartburn and is more effective than other antacids at relieving night time symptoms; and

(3) MNTS is an appropriate treatment for Gastroesophageal Reflux Disease ("GERD") because the "toughest" night time heartburn describes symptoms associated with GERD;

(4) MNTS provides all night long heartburn relief.

In response, J & J contends that Novartis acknowledges that the claims it challenges do not appear *in haec verba* in the ads, that the "necessary implication" doctrine does not apply because the cases that were decided on that doctrine involved ads that were susceptible to only one misleading

---

**6.** False advertising may be based on or consist of literally false statements. False advertising involving statements that were literally false have included advertising of goods not in stock, the claim that overcoats contained 50 percent of a specified material when in fact the coats contained 25 percent or less of the material, claims that defendant's golf rainsuit was the "best waterproof suit available" or "the best way to keep dry," as well as a national television advertisement claiming nine hundred women agreed that a shampoo was better than Prell, where the subject survey failed to support such a claim. When advertising or label statements are "literally

false," "patently false," "actually false," "false on its face," demonstrably false, or explicitly false, no consumer reaction evidence is necessary for the court to grant injunctive relief. False statements are presumed to be material.

Charles E. McKenney & George F. Long, III, *Federal Unfair Competition: Lanham Act § 43(a)*, § 6.03[1] (11/2000).

**7.** "In these words; in the same words." Henry Campbell Black, *Black's Law Dictionary*, (6th Ed.1990).

interpretation, and finally, that Novartis's own consumer survey does not show that the claims are deceptive or misleading.

#### a. *Literally False Claims*

##### i. *Sleep Aid Ingredient*

■ Novartis argues that the product name conveys a literal falsehood that MNTS has sleep aid-like properties that will help heartburn sufferers fall asleep and stay asleep. Novartis contends that J & J's disclaimer that MNTS "Does Not Contain a Sleep Aid" is ineffective because it is written in only 1/16th inch high letters and buried on the back of the package in contrast to the 6/16th inch high "Night Time" on the front label.

J & J, however, has made no explicit claim in any of its promotional materials that MNTS contains a sleep aid or other ingredient that causes drowsiness. Moreover, the product name, "Night Time Strength" does not convey a literal falsehood because it does not necessarily imply that the product contains a sleep aid or other ingredient that causes drowsiness. Therefore, the Court finds that J & J has not conveyed the literal falsehood that MNTS contains a sleep aid.

##### ii. *Efficacy*

Novartis does not challenge J & J's claim that MNTS is the "strongest" based on its ANC rating. Pl.'s Br., at 6. It contends, however, that J & J's claim of a superior product based solely on its higher ANC strength rating is a falsehood. According to Novartis, J & J disseminates literally false claims by explicitly equating its strength to superior effectiveness:

- "STRONG relief;" "Fast nighttime relief … [T]he first and only antacid formulated specifically to relieve your toughest nighttime heartburn." (Labeling and website)
- "Finally, something strong enough to get rid of even your toughest nighttime heartburn." (Television advertisement)
- "Specially formulated" or "made just for" night time heartburn to allow heartburn sufferer to "enjoy [the] night." (Television advertisement)
- "My Solution For Heartburn at its Worst." (Free standing insert)

■ J & J responds by pointing out that it is no longer running any of the original advertisements. Miller Decl. at ¶ 22. When Novartis objected to the advertisements, J & J revised these statements and discontinued making the "specially formulated" and "made just for" claims in all of its advertising materials. *Id.* at ¶ 28. J & J has also removed the statement "[f]inally, something strong enough to get rid of even your toughest nighttime heartburn." *Id.* Moreover, J & J represents that it does not intend to make such claims in the future. *Id.* at ¶¶ 23, 28. Therefore, Novartis's request for preliminary injunctive relief as to these specific claims is moot. *See Parkway Baking Co. v. Freihofer Baking Co.,* 255 F.2d 641, 648 (3d Cir.1958) (affirming denial of injunction in Lanham Act case where conduct complained of had ceased); *American Express Travel Related Servs. Co. v. MasterCard Int.'l Inc.,* 776 F.Supp. 787, 791 (S.D.N.Y.1991) ("When a defendant revises an allegedly infringing commercial and represents that the original commercial will not be broadcast in the future, the need for injunctive relief as to the original commercial is moot").

■ Novartis, however, continues to object to any claims that MNTS is a superior product that actually performs better than antacids with lower ANC ratings such that it is effective enough or uniquely effective for "night time" sufferers. In response, J & J maintains that the alleged claim of superior relief is neither explicitly stated nor "necessarily implied" in the MNTS label or advertising. That contention, however, is discredited by J & J's own explanation for why it designated the product "Night Time Strength." J & J contends that the "reason the product is called 'Night Time Strength' is that …

'nighttime symptoms are usually worse'" and that "[n]ighttime sufferers thus are likely to opt for a higher strength antacid..." Def.'s Opp'n Br. at 14. While night time sufferers may indeed be likely to opt for a higher strength antacid, the "Night Time Strength" designation does more than simply promise a "higher" strength; it claims that its strength corresponds to effectiveness such that it can even remedy night time heartburn, the symptoms of which tend to be "severe" or "moderate".

Consistent with the label, the television commercial promises that MNTS is "made strong to work on even tough nighttime heartburn." J & J's website also provides that MNTS "works on even your tough nighttime heartburn." Despite the FDA conclusion that the ANC rating might confuse the public, the MNTS product name and advertising play upon and reinforce the perception that greater strength provides relief for more severe heartburn, which often can occur at night. In other words, MNTS is named and advertised to suggest that its strength gives it the ability to fight greater heartburn. Therefore, J & J's advertisements necessarily imply a claim of superior relief.

The Court must next determine whether such a claim is literally false or misleading. First, although J & J admits that it has produced no proven correlation between a higher ANC rating and superior relief, it argues that Novartis has failed to meet its burden to prove a lack of correlation between a higher ANC rating and greater symptom relief. *See Sandoz*, 902 F.2d at 228 ("a Lanham Act plaintiff bears the burden of showing that a challenged advertisement is false or misleading, not merely that it is unsubstantiated by acceptable tests or other proof.") (citing *Procter & Gamble Co. v. Chesebrough–Pond's, Inc.*, 747 F.2d 114, 119 (2d Cir. 1984)). J & J's assertion lacks merit.

Initially, J & J's position that MNTS' higher ANC strength does, or at least might, correspond to the product's efficacy is an unabashed contradiction of its posi-

tion in the *Rorer* litigation. In that case, J & J alleged that television commercials by the defendant Rhone–Poulenc Rorer Pharmaceuticals, Inc. ("Rorer"), about its product Extra Strength Maalox Plus ("ESMP"), were misleading and in violation of the Lanham Act. Specifically, J & J, in moving for a preliminary injunction, argued that Rorer's description of ESMP as "the strongest antacid there is" misled consumers to believe that ESMP was superior as a treatment for heartburn. When litigating that case, J & J unequivocally swore, among other things, that:

- "The laboratory ANC is not a sufficiently reliable predictor of antacids' comparative efficacy ... [for] relief in the body," Johnson–Merck Prelim. Injunction Br. at 6–7 attached as Ex. 1 to Potenza Decl.;
- "[I]t cannot reasonably be presumed that an antacid with a slightly higher ANC rating would necessarily perform better in the body at neutralizing gastric acid than would an antacid with a slightly lower ANC rating," Affidavit of Dr. David Y. Graham, at ¶ 15 attached as Ex. 2 to Potenza Decl.;
- Higher ANC ratings did not "translate into a superior ability ... to neutralize acid in either the stomach or the esophagus," Affidavit of Dr. Malcolm Robinson, at ¶ 16 attached as Ex. 3 to Potenza Decl.

Previously having unequivocally asserted the opposite argument, J & J is now judicially estopped from alleging that the ANC strength in fact correlates to or measures efficacy *in vivo*. *See Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 361 (3d Cir.1996) ("judicial estoppel is intended to prevent parties from playing fast and loose with the courts by asserting inconsistent positions" in separate judicial proceedings).

The proofs presented by J & J in *Rorer* also lend support to Novartis's claims in this case. Moreover, Novartis has submit-

ted its own affidavits to support the theory that the ANC rating does not measure the ability to neutralize acid in the stomach or the esophagus, Albrecht Decl., at ¶ 10; Castell Decl., at ¶ 6, and that the additional 50 mg. of magnesium hydroxide in MNTS is clinically proven "to be irrelevant to efficacy in the body," Castell Decl., at ¶ 7. Dr. Castell, who was also an expert for J & J in the *Rorer* litigation, now states: "[n]othing has changed in the seven years since I testified, on the basis of J & J's own comprehensive clinical study, that slight differences in ANC do not have clinical significance." *Id.* at ¶ 9. Based on such evidence, the Court finds that Novartis has met its burden of persuasion to show a lack of connection between ANC strength and *in vivo* efficacy; it is therefore likely to succeed on the merits of its Lanham Act claim.

Finally, J & J supports its advertising claims by arguing that it is merely continuing what traditionally every antacid manufacturer, including Novartis, has engaged in—promotion of its products on the basis of strength or ANC rating. *See Rorer,* 19 F.3d at 132 ("Both the earlier Mylanta advertising and the Maalox advertising have tried to exploit the consumer confusion the FDA feared between the results of ANC tests and symptom relief. The advertisements tout the ANC strength, promise symptom relief, and invite consumers to make the connection"). The Court is not persuaded by this contention for several reasons.

First, the observation in *Rorer* was made by the Third Circuit in support of its determination that J & J's intent to mislead was not of an egregious nature such that it warranted a burden shifting presumption. Moreover, what representations may have historically been made is not legally relevant to the determination of whether a false claim is permissible under the Lanham Act.

Second, J & J's assertion that its advertising for MNTS merely continues the tradition that the marketers of Maalox fought

to preserve is incorrect. In *Rorer,* what Rorer fought to maintain was its description of its product as "the strongest antacid there is." *See* Miller Decl. Exs. 8a-g,9 (Maalox ads claiming "strength" or "speed" based on ANC strength). To the extent that the Third Circuit examined Rorer's intent to convey a message of superior relief, it was only to determine whether the burden of proof should have shifted to the defendant. Moreover, Maalox ads that depict sufferers waking up at night are those that (1) compare Maalox with Pepcid AC or Zantac 75, stomach acid blockers, which indisputably take longer than antacids to provide relief, *see* Miller Decl. Exs. 11, 12a; (2) compare Maalox with Gaviscon emphasizing its uniqueness as a barrier method, *id.* at Ex. 12c; and (3) tout stomach acid blockers that, because such products actually do last for 8 hours, legitimately can make night time claims, *id.,* Ex. 12b, 12d-j.

As an aside, even if Novartis had not met its burden, the paucity of proof upon which J & J relies to claim that the slightly higher ANC of its product provides more effective relief is troubling. *See Upjohn Co. v. Riahom Corp.,* 641 F.Supp. 1209, 1223 (D.Del.1986) (finding that defendant's characterization of its product as cosmetic and not promoting hair growth, whether true or false, created deceptive impression because despite absence of direct proof that product promoted hair growth, there was also no basis for claim it was cosmetic since defendants had never tested product to determine lack of efficacy for hair growth). J & J admits that it is unaware "of *any* data from controlled clinical studies that proves, one way or the other, whether antacids with higher ANC ratings provide better heartburn relief than antacids with lower ANC ratings" but nevertheless maintains that it is a "plausible hypothesis." Korn Decl., at ¶ 10 (emphasis added). Notwithstanding the absence of any supporting evidence, J & J then concludes that,

it is reasonable to expect that, all things being equal, some patients will derive better relief from an antacid with a higher ANC rating than an antacid with a lower ANC rating.

*Id.;* Def.'s Opp. Br. at 19, n. 3. J & J's theory is premised on the assumption that there is no reason to expect that antacids would differ from "most drugs," which have a dose response—i.e. an increase in effect with an increase in dose—and on the "common belief" reflected in at least one text, *Drug Facts and Comparisons,* that "antacids with high ANC are usually more effective *in vivo." Id.* at ¶¶ 11, 13.

As counsel for J & J argued to the Court at the December 19th proceeding, to assert and rely on an unsubstantiated hypothesis is prohibited by the FDA. "You cannot market a product or you cannot make a claim that is regulated by FDA unless you have proved to FDA's satisfaction that, in fact, that claim is true, in the case of effectiveness that the ingredient does what you say it does." Dec. 19 Hearing Tr., 86:3–6. It is undisputed that the FDA has not permitted the ANC rating on product labels for fear that consumers rely on this information as an indication of effectiveness. *Rorer,* 19 F.3d at 127.

In *Sandoz,* the Third Circuit specifically declined to address "whether completely unsubstantiated advertising claims violate the Lanham Act absent proof that consumers are actually misled by this lack of substantiation." *Sandoz,* 902 F.2d at 228, n. 7. Nevertheless, the court went on to note that

> [i]n such a case, there is a plausible argument that the claim is literally false because the advertiser has absolutely no grounds for believing that its

*claim is true.* A Lanham Act plaintiff may be permitted to presume that consumers expect advertisers to have at least some semblance of support for their publicly-disseminated claims. However, since that is not the question before us, we do not decide whether a completely unsubstantiated claim is per se false or whether a Lanham Act plaintiff can presume that a defendant must have some substantiation for its advertising claims.

*Id.* (emphasis added). Based on the Third Circuit's insight, it would be plausible that here, J & J's claim that MNTS remedies night time heartburn would be per se false given that the advertiser relies on pure speculative hypothesis and does not appear to have "at least some semblance of support" for its claim.

### iii. *"Nighttime Heartburn" and GERD*

Novartis objects to J & J's claim that MNTS will treat the "toughest nighttime heartburn" on two grounds.

First, Novartis asserts that the "toughest," most persistent heartburn that occurs at night can be symptomatic of Gastroseophageal Reflux Disease ("GERD"), a more serious condition characterized by frequent acid reflux episodes and chronic heartburn, which should not be treated simply with OTC antacids. Although J & J continues to claim that MNTS remedies "tough" night time heartburn, as discussed above, J & J no longer claims that MNTS relieves the "toughest" night time heartburn. Therefore, the request for a preliminary injunction as to this claim is moot.[8]

Second, Novartis contends that there is no separate medical condition[9]

---

8. Although J & J has not made any promises that it will refrain from making such claims in the future, the Court cannot enjoin conduct that is not a presently existing harm or threat. *See Johnson v. Guhl,* 91 F.Supp.2d 754, 766–67 (D.N.J.2000).

9. During the December 19th proceeding, counsel for J & J incorrectly characterized Dr. Castell's declaration as saying that "night-

time heartburn" is "something that Johnson & Johnson made up." Dec. 19 Hearing Tr., 9.19–22. In the Court's interpretation of Dr. Castell's Declaration, Dr. Castell does not accuse J & J of inventing the term out of whole cloth, but rather, explains that nighttime heartburn is the same medical condition as daytime heartburn notwithstanding any differing levels of severity.

known as "night time heartburn," as heartburn is the same condition or occurrence, whether it occurs at night or during the day. Albrecht Decl., at ¶ 15. Further, Novartis provides that "[a]cid reflux, whether it occurs in the morning, noon or night, is the same underlying condition, treated in the same way with the same medications." Castell Decl., at ¶ 3. J & J does not specifically dispute these assertions, but does maintain that heartburn symptoms are most prevalent after a meal and at night. Korn Decl., at ¶¶ 3–4.

Although J & J does not argue or present any evidence to show that MNTS was specifically formulated for night time heartburn or that its product actually remedies heartburn at night more effectively than heartburn during the daytime, the "Nighttime Strength" designation necessarily communicates that MNTS is in fact specifically or especially suited for night time use. See Warner–Lambert Co. v. Breathasure, Inc., 204 F.3d 87 (3d Cir. 2000); Cuisinarts, 1982 WL 121559.

In Breathasure, the defendant, a marketer of breath freshening products, heavily promoted its products as being effective against bad breath by effectively working at the source of bad breath. The defendant, BreathAsure, claimed that therefore, its product was superior to products that simply masked bad breach such as gum, mints, and mouthwash. Arguing that BreathAsure's claims of being an effective breath freshener were unsupported, Warner–Lambert, sued to permanently enjoin BreathAsure from advertising that its BreathAsure products are effective breath fresheners and to enjoin against use of the name "BreathAsure" on the basis that the name itself communicated a false and misleading message. During trial, BreathAsure stipulated that scientific studies demonstrated that BreathAsure and BreathAsure–D, which were two of the defendant's products, were not effective in reducing bad breath. Accordingly, the defendant consented to an injunction with respect to

its advertising; however, it continued to fight any injunction against the use of the trade names "BreathAsure" and "BreathAsure–D." Upon the completion of trial, the district court found that the defendant's trade names misrepresented the products' qualities and that the claims of breath assurance were literally false. Nevertheless, the district court refused to enjoin use of the trade names after concluding that the plaintiff failed to establish a likelihood of injury.

On appeal, the Third Circuit agreed with the lower court that "[t]he name falsely tells the consumer that he or she has assurance of fresher breath when ingesting one of the defendant's capsules. That is not true." Breathasure, 204 F.3d at 97. Moreover, concluding that the plaintiff had in fact demonstrated a reasonable likelihood of injury, the Circuit reversed the lower court's denial of the plaintiff's request to enjoin the defendant from using "BreathAsure" or "BreathAsure–D" or any similarly misleading trade name. See also Castrol, 987 F.2d at 946–48 (finding defendant's claim that viscosity breakdown leads to engine failure and that it outperforms any leading motor oil against viscosity breakdown necessarily implies that defendant outperforms other leading brands with respect to protecting against engine failure).

Another example of a case involving a claim that was false by necessary implication is Cuisinarts, 1982 WL 121559. In that action, the defendant's advertisement stated: "Robot–Coupe: 21, Cuisinart: 0. WHEN ALL 21 OF THE THREE–STAR RESTAURANTS IN FRANCE'S MICHELIN GUIDE CHOOSE THE SAME PROFESSIONAL MODEL FOOD PROCESSOR, SOMEBODY KNOW THE SCORE—SHOULDN'T YOU?" The advertisement necessarily implied that the plaintiff and the defendant both built professional model food processors, and that restaurateurs, presented with two existing alternatives, had chosen defendant's model over plaintiff's model. The court found

the defendant's advertisement to be false by implication because the plaintiff undisputably did not market a professional model food processor.

Here, by naming its product "Night Time Strength," J & J maintains that its goal was to emphasize the *strength* of the product, rather than its duration. Clearly, designations such as "regular," "extra," or "maximum" would have sufficiently described the level of strength of MNTS. The use of "nighttime," however, is as Novartis points out, a temporal designation communicating that the product is effective in remedying "nighttime" heartburn. *Cf. Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1040–41 (2d Cir.1992) ("PM" designation immediately conveys night time use). Indeed, J & J admits that MNTS is "targeted exclusively to the needs of nighttime sufferers." Miller Decl., at ¶ 17.

As in *Breathasure* and *Cuisinarts*, the product name, Mylanta "Night Time Strength," necessarily implies a false message: it falsely represents that it possesses a quality that is particularly efficacious for those suffering from heartburn at night. But that is not true. Additional ANC strength does not make the product any better whether it is used during the day or the night. It is not the same as labeling the product "maximum" strength, which would be true because it is based on the ANC rating. J & J would have the Court treat this as nothing but a marketing tool—this product is good for nighttime use. But by claiming "nighttime strength" it is representing a quality that in fact it does not actually possess and, therefore, is literally false in violation of § 43(a)(2). *See Castrol*, 987 F.2d at 944 (emphasizing that if "defendants' claim is untrue, it must be deemed literally false.")

### 2. Deceptive or Misleading As Indicated By A Consumer Survey

Novartis argues that although antacids only provide relief for 30–60 minutes, the name and labeling of MNTS misleads, confuses, and deceives a substantial number of consumers into believing it will provide relief throughout the night. To support its allegation that the MNTS labeling is misleading, Novartis relies on a survey designed by Dr. Gerald L. Ford, a survey expert with twenty-five years' experience in marketing research and consulting.

■ A well-designed consumer survey

first asks "communication" questions to see what messages the viewer got and to "filter" or separate those viewers who received certain messages from those who did not. In the next step, the survey asks those who received a particular message, ... "comprehension" questions to determine what the viewers thought the message meant.

*Rorer*, 19 F.3d at 134. " 'The probative value of a consumer survey is a highly fact-specific determination and a court may place such weight on survey evidence as it deems appropriate.' " *Rorer*, 19 F.3d at 134 (citing *Weight Watchers Int.'l, Inc. v. Stouffer Corp.*, 744 F.Supp. 1259, 1272 (S.D.N.Y.1990)). A survey that relies on leading questions that are " 'inherently suggestive and invite guessing by those who did not get any clear message at all' " is not credible. *Id.* The survey must show that the allegedly false or misleading advertising tends to deceive or mislead " 'a substantial portion of the intended audience.' " *Rorer*, 19 F.3d at 134 (citing *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 922 (3d Cir.1990), *cert. denied*, 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990)).

Dr. Ford's survey was administered in shopping malls around the country to 432 people who identified themselves as likely buyers of antacid products. Neither the interviewees nor the interviewers were aware of the purpose of the survey. The interviewees, or respondents, were shown Regular Strength Mylanta, Extra Strength Mylanta (formerly labeled Maximum Strength Mylanta), Mylanta Supreme, and

MNTS. The respondents were divided into two groups (or cells); an experimental cell was asked to focus on MNTS and a control[10] cell was asked to focus on Extra Strength Mylanta ("ESM"). Ford Decl., at ¶¶ 8–13.

After permitting the respondent to review the label of the particular product, the interviewer asked the open-ended "communication" question: "what is the main message communicated by the labeling on this product?" (Q6.0). It was followed by a "probe" question, which was asked twice: "what other messages, if any, are communicated by the labeling on this product?" (Q6.1, Q6.2). Those questions were then followed by:

- Again, based just upon your review, does the labeling on this product communicate anything to you about how long this product will provide relief? (Q7.0).
- (If "yes") What does the labeling communicate to you with regard to how long this product will provide relief? (Q7.1).
- Why do you say that? (Q7.2).
- Again, based just on your review, does the labeling on this product communicate anything to you about how long, in hours, this product will provide relief? (Q7.3).
- (If "yes") What does the labeling communicate to you with regard to how long, in hours, this product will provide relief? Why do you say that? (Q7.4).
- Why do you say that? (Q7.5).

J & J's argues that the Court should give Dr. Ford's survey little or no weight. J & J first criticizes the survey as containing questions that are result driven, leading or suggestive. It is improper, J & J contends, to question respondents on the specific message of duration when most of

the responses to the first three questions showed that the subject received no message regarding the product's duration; in other words, the questions regarding duration were not preceded by a question filtering out those who had not stated that there was a message regarding duration.

Novartis responds by claiming that the Ford survey does not use leading questions and moreover, that even if some of the questions were leading, its use of a control group eliminated any purported bias that may have resulted from such any such questions. The Court agrees with Novartis. None of the questions posed by the Ford survey are leading because they do not suggest an answer. *See Woods v. Lecureux*, 110 F.3d 1215, 1221 (6th Cir. 1997) ("It is elementary that a leading question is one that suggests an answer"). Dr. Ford's survey began with open ended questions (Q6.0—Q6.2), then "filter" questions followed (Q7.0 and Q7.3) to separate those consumers who received a message regarding duration from those who did not. Questions that focus on whether a consumer received a particular message are appropriate when it can be shown, through "filter" questions, that respondents are receiving some message from the stimulus. *See Rorer*, 19 F.3d at 134; *see also Church & Dwight Co., Inc. v. S.C. Johnson & Son, Inc.*, 873 F.Supp. 893, 908 (D.N.J.1994).

Additionally, bias that may have resulted from any leading questions was eliminated by use of the control group. *Volkswagen Aktiengesellschaft v. Uptown Motors*, 1995 WL 605605, at *4, 1995 U.S. Dist. LEXIS 13869, at *16 (S.D.N.Y. May 11, 1995) ("since the same question was used with the group that was shown an ad with a logo and the control group that saw the same ad except for the replace-

---

**10.** The control cell is supposed to "control" extraneous factors (known as "noise") that do not reflect on any messages conveyed by the name or labeling of MNTS. "Specifically, the control cell functions as a baseline and provides a measure of the degree to which respondents are likely to give an answer indi-

cating a time period of relief, not as a result of the name or labeling, but because of other factors, such as the survey's questions, the survey's procedures, the nature of the product, or some other potential influence on a respondent's answer such as pre-existing beliefs." Ford Decl., at ¶ 12.

ment of the logo with the name, any distorting effect from the [allegedly leading] question was cancelled out.")

■■■ J & J further believes that Dr. Ford's survey is flawed because products were left in front of the respondent for the entire interview. J & J asserts that such a technique fails "to simulate with any remote realism how consumers actually" behave and turns the survey into "more [of] an open book test than a measure of realistic consumer reaction." *American Home Products Corp. v. Procter & Gamble Co.,* 871 F.Supp. 739, 761 (D.N.J.1994). Contrary to J & J's position, the Court finds that leaving the products for the respondents to examine rather than taking the products away replicates market conditions. *See Starter Corp. v. Converse, Inc.,* 170 F.3d 286, 297 (2d Cir.1999) (finding that survey where products were covered with cloth after enabling respondents to view products briefly rendered survey "little more than a memory test"); *Barre-Nat'l, Inc. v. Barr Labs., Inc.,* 773 F.Supp. 735, 745 n. 20 (D.N.J.1991) (noting survey is less probative where, among other things, materials taken away during question period).

■■■ Next, J & J disagrees with Novartis's conclusion of what percentage of consumers in Dr. Ford's survey derived an all night duration message. According to Novartis, in the experimental cell, approximately 30% of respondents expressed their belief that MNTS provided relief that lasted the whole night. In the control cell, only 5% believed that Mylanta Extra Strength provided relief that lasted all night. When the "noise" [11] is subtracted from the survey results, it leaves a total of 25% who believed MNTS provided all night relief, which is an amount sufficient to find a violation of the Lanham Act.

Rather curiously, from the same survey, J & J concludes that 37% of the test cell respondents indicated some duration message, compared to 17.6% in the control cell. After netting out the noise, the result is 19.4%; however, J & J contends that that figure is overstated because only 80% of the 19.4% received an *all night* duration message rather than simply *some* duration message. Therefore, J & J concludes that the net percentage of consumers who received an all night message from the label was only 15.5%, which J & J claims is an insufficient number for a finding of implied falsity.

After a careful review and comparison of the different percentages of deception reached by each party, the Court agrees with Novartis' method of analysis. J & J's calculation treats as "noise" all answers that indicated any duration of relief for Extra Strength Mylanta, whether 4 hours, 8 hours, or just "fast." That is incorrect because for example, responses indicating that ESM provides "fast" relief cannot account for problems in the survey's questions or procedures because ESM has "fast acting" written across the front label. Therefore, such responses cannot be netted out as "noise." It is well established, and undisputed by J & J, that 25% is a sufficient level of confusion to support a finding of implied falsity in violation of the Lanham Act. *See Church & Dwight Co. v. S.C. Johnson & Son,* 873 F.Supp. 893, 911 (D.N.J.1994) (" '[c]ourts have found survey figures to be sufficient when they revealed that 21 percent to 34 percent, over 25 percent, and 33 percent of respondents received a misleading message from the ad.' ") (citing 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §§ 32:54[4], at 32–249 (3d ed.1994)); *McNeilab, Inc. v. American Home Products Corp.,* 501 F.Supp. 517, 525, 527 (S.D.N.Y.1980) (finding that 23% confusion was "ample support" for Lanham Act claim).

---

11. Dr. Ford netted out the noise from the survey results to isolate the true misunderstanding caused by MNTS name and packaging. Ford Decl., at ¶ 12; *Procter,* 871 F.Supp. at 749–50 (approving of survey that controlled for noise); *see also* n. 10, *supra.*

Even assuming that J & J is correct that only 15.5% of the respondents were misled, that percentage is sufficient to show that, under the Lanham Act, the "Night Time Strength" name tends to deceive or mislead a substantial portion of the intended audience. *See Coca–Cola Co. v. Tropicana Products, Inc.,* 538 F.Supp. 1091 (S.D.N.Y.), *rev'd* 690 F.2d 312 (2nd Cir. 1982). In *Coca–Cola,* after an independent review, the district court concluded that the survey showed no more than 7.5% of viewers might have been misled by the allegedly false advertising and that "[a] level of consumer confusion significantly below 15% does not indicate plaintiff's probable success on the merits." *Id.* at 1096. Despite various flaws in the survey, however, the court ruled that the number of clearly deceived respondents was "small, but not de minimus." *Id.* at 1097. The court ultimately denied preliminary injunctive relief finding that the plaintiff had not shown evidence of irreparable injury.

The district court's denial of the plaintiff's application for a preliminary injunction was reversed by the Second Circuit. In addition to finding that the challenged advertising was false on its face, the Circuit noted that the lower court should have considered survey evidence to determine irreparable injury because the surveys demonstrated that "a significant number of consumers would be likely to be misled." *Coca–Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312, 317 (2nd Cir.1982). The *Coca–Cola* decision clearly suggests that a 15.5% of consumer confusion is sufficient to show that, under the Lanham Act, the advertising tends to deceive or mislead consumers.

In addition to the fact that consumers are misled to believe that MNTS provides all night relief, as discussed above, the name and advertising of MNTS necessarily imply false claims regarding the product's efficacy and specific use for "nighttime" heartburn. The Court finds that such false and misleading statements are deceptive or at least have a tendency to deceive a substantial portion of the intended audience. Moreover, because J & J's efforts to market MNTS are targeted to nighttime heartburn sufferers, it is likely to influence those consumers' purchasing decisions. Therefore, Novartis is likely to succeed on the merits.

### C.   *Irreparable Harm*

#### 1.   *Standard*

■■■    Where the challenged advertising makes a misleading comparison or reference to a competitor's product, irreparable harm is presumed. *See McNeilab, Inc. v. American Home Products Corp.,* 848 F.2d 34, 38 (2nd Cir.1988); *see also Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1146 (9th Cir.1996) ("for false *comparative* advertising claims, this circuit has held that '[p]ublication of deliberately false comparative claims gives rise to a presumption of actual deception and reliance.' " (emphasis added) (citing *U–Haul Int'l, Inc. v. Jartran, Inc.,* 793 F.2d 1034, 1040–41 (9th Cir.1986)).

■■■    In contrast, where a false or misleading advertisement touting the benefits of a product is non-comparative and makes no direct reference to any competitor's product, irreparable harm is not presumed. *Id.; see also Johnson & Johnson v. Carter–Wallace, Inc.,* 631 F.2d 186, 190 (2nd Cir.1980). Although the plaintiff need not come forward with specific evidence that the challenged claims actually resulted in some definite loss of sales, the plaintiff must establish that it has a reasonable basis for believing that it is likely to suffer injury as a result of the false advertising. *Carter–Wallace, Inc.,* 631 F.2d at 190; *see also Breathasure, Inc.,* 204 F.3d at 95–96 ("A showing of reasonable belief of injury will usually be sufficient to establish a reasonable likelihood of injury under § 43(a).")

### 2. *Analysis*

■ According to the Gallup survey, 53% of those using medication to control night time heartburn agreed that "they would try anything new to relieve heartburn at night." *See* Gleber Decl., at ¶ 16, Ex. J. at 31. In light of consumers' desire for a new night time heartburn treatment and given that Maalox and Mylanta antacids function in nearly identical ways and offer consumers nearly identical benefits, Novartis contends that J & J's advertisement that MNTS provides a unique night time benefit will have an enormous and irreversible effect on market share.

In fact, Novartis alleges that MNTS has already had a measurable effect on Maalox's market share as reflected by the fact that the decrease in sales of Maalox over the last few weeks corresponds to the increased sales for MNTS. Gleber Decl., at ¶¶ 17–18. Novartis insists that loss of market share is the epitome of irreparable harm because it is so difficult to recover. *See, e.g. American Home Products Corp. v. Abbott Labs.*, 522 F.Supp. 1035, 1038 (S.D.N.Y.1981). Moreover, Novartis claims that MNTS has procured valuable shelf space in stores that allegedly would otherwise have displayed Maalox products. Lewis Decl., at ¶ 5.

J & J, however, challenges Novartis's conclusion by arguing that Novartis has not accounted for its shift of promotional efforts away from Maalox liquids and toward quick dissolve tablets. Moreover, J & J explains that Maalox's decrease in sales could also be attributed to special promotions, such as the $.50 off coupon that J & J distributed for MNTS in August. Further, J & J points out that Maalox was suffering from a modest decline in market share even during the five months prior to the launch of MNTS and that the historical pattern of Maalox's market share paralleling Mylanta's has remained the same. *See* Miller Decl., Ex. 19.

Notwithstanding J & J's efforts to explain the reasons for Maalox's loss of market of share, the Court finds that the decrease in Maalox's sales constitutes a reasonable basis for believing that it is likely to suffer injury as a result of J & J's false advertising. After all, Novartis need not come forward with specific evidence that the challenged claims actually resulted in some definite loss of sales.

■ Finally, J & J contends that Novartis's claim of irreparable harm is undermined by its seven month delay in bringing this motion after learning of the MNTS product. Novartis insists, however, that as soon as MNTS had a measurable impact on the market and on its good will, it notified J & J of its objections, promptly challenged the advertisements with the major networks, obtained the results of Dr. Ford's survey, and shortly thereafter, brought this action. The Court finds that Novartis's good faith efforts to investigate the facts and pursue remedies outside of litigation do not undermine Novartis's claim of irreparable harm. *See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 264 (3d Cir.2000) (recognizing that good faith efforts to investigate and determine seriousness of violation do not preclude finding of irreparable harm); *Fisher–Price, Inc. v. Well–Made Toy Mfg. Corp.*, 25 F.3d 119, 124–25 (2nd Cir.1994) (finding that six month delay to investigate and determine extent of infringement before seeking injunction was reasonable).

Therefore, Novartis has made a sufficient showing of irreparable injury.

### D. *Balance of Hardships*

■ If J & J is preliminarily enjoined from using the designation "Night Time Strength," in addition to losing the value of what it spent to bring MNTS to market, J & J would have to relaunch its product under a new name and incur the related expense pending completion of this litigation. Moreover, regardless of the outcome, J & J claims it would be commercially unfeasible for it ever to return to the original MNTS name. *See Genovese Drug*

*Stores, Inc. v. TGC Stores, Inc.,* 939 F.Supp. 340, 350–51 (D.N.J.1996).

Nevertheless, because Novartis has established a likelihood of success on its allegations that the "Night Time" designation constitutes false and misleading advertising, J & J cannot claim any legal entitlement to any economic benefits resulting from such false advertising. Moreover, any financial loss that will be suffered by J & J as a result of its decision to name its product "Night Time Strength" is self-imposed. *See W.L. Gore,* 788 F.Supp. at 812. Therefore, the balance of equities favors a grant of injunctive relief.

### E. *Public Interest*

█ There is a strong public interest in preventing misleading advertisements, particularly where OTC drugs are concerned. *American Home Products Corp. v. Johnson & Johnson,* 654 F.Supp. 568, 590 (S.D.N.Y.1987). The designation "night time strength" necessarily implies that the antacid is specifically intended to relieve heartburn that occurs at night. *See* discussion *supra.* J & J does not dispute that other than its assumption that the higher ANC strength remedies more severe symptoms, there is no special formulation of MNTS that makes it more appropriate to ingest at night than during the day. It is certainly in the public interest to prohibit such false and deceptive claims.

### III. *CONCLUSION*

For the reasons noted herein, Novartis's motion for a preliminary injunction is **granted.**

An appropriate Order follows.

### ORDER

This matter having come before the Court on Plaintiff's motion for a preliminary injunction pursuant to Fed.R.Civ.P. 65; and

The Court having considered the submissions of the parties; and

The Court having heard oral argument on December 18, 2000; and

For the reasons set forth in the Court's Opinion issued this day; and

For good cause shown;

It is on this 22nd day of December, 2000 ORDERED that Plaintiff's motion for a preliminary injunction is **granted;** and

IT IS FURTHER ORDERED that Defendant Johnson & Johnson–Merck Consumer Pharmaceuticals Co., and its officers, directors, agents, servants, employees, representatives, successors, affiliates, assigns and all others in active concert and participation with it, are enjoined from (a) marketing and disseminating Mylanta Night Time Strength under that name; (b) using the designation "Night Time" or "Night Time Strength" on any antacid product; (c) otherwise claiming, either explicitly or implicitly, in any packaging, advertising, or other promotional materials, that Mylanta Night Time Strength is specially formulated for night time heartburn, provides all night relief, and/or possesses a strength that correlates with its efficacy; and

IT IS FURTHER ORDERED that Defendant shall file with the Court and serve on counsel for Plaintiff within ten days after entry of this Order a sworn written statement pursuant to 15 U.S.C. § 1116(a) setting forth in detail and including exhibits demonstrating the manner and form with which this Order has been complied; and

IT IS FURTHER ORDERED that Plaintiff shall initially post security in the amount of $1,000,000 prior to December 29th, 2000, at 5 p.m., and that the amount of the bond may be modified upon receipt of additional documentation from the parties.