KIS, S.A., PMI Photomagic, Ltd., and Image Dynamics, LLC., Plaintiffs,

v.

FOTO FANTASY, INC. d/b/a Fantasy Entertainment, Inc. and American Photo Booths, Inc., Defendants.

Civil Action No. 3:99–CV–1356–M.

United States District Court, N.D. Texas, Dallas Division.

Oct. 18, 2001.

Robert D. Yeager, James M. Joyce, Patrick J. McElhinny, Thomas A. Donovan, Kirkpatrik & Lockhart, Pittsburgh, PA, Jeffrey L. Snow, Kirkpatrick & Lockhart, Boston, MA, Stephen A. Kennedy, Elizabeth K. Stepp, Frederick Linton Medlin, Michael D. Napoli, Jacqueline R. Peterson, Delia Spencer, Kirkpatrick & Lockhart, Dallas, TX, for plaintiffs.

P. Weston Musselman, Jr., Jenkins & Gilchrist, Dallas, TX, Jay M. Vogelson, William F. LePage, Stutzman & Bromberg, Dallas, TX, Brett N. Dorny, Thomas M. Sullivan, A. Jason Mirabito, Michael T. Renaud, Mintz Levin Cohn Ferris Glovsky & Popeo, Boston, MA, Richard C. Sullivan, Jr., Reed Smith, McLean, VA, Alexander Y. Thomas, Reed Smith, Falls Church, VA, Jules E. Goldberg, Reed Smith, New York City, for defendants.

John F. Booth, Crutsinger & Booth, Dallas, TX, pro se.

## ORDER

LYNN, District Judge.

Before the Court is Defendants' Motion to Strike the Expert Report of Dr. Daniel J. Howard and to Exclude His Testimony from Trial. Having considered the motion, and the Response, Reply, and Appendices thereto, the Court is of the opinion that the motion should be DENIED for the reasons below.

### I. Background

Plaintiffs have filed suit against Defendants alleging, *inter alia,* that Defendants have violated the Lanham Act, 15 U.S.C. § 1125. Plaintiffs' Lanham Act claim stems from Defendants' use of drawings of Tom Cruise and Marilyn Monroe on the outside of their photo booths. Defendants and Plaintiffs both own photo booths that are placed inside malls around the country. The booths operate by allowing the user to either have a picture taken inside of the booth, or to insert a photo brought into the booth by the user, so that the machine can transform the picture into a sketch. On the outside of Defendants' booths (a.k.a. "Portrait Studios") are sketches of Tom Cruise and Marilyn Monroe. On one corner of these celebrities' sketch images reads the phrase, "SCAN IN YOUR FA-VORITE CELEBRITIES." Plaintiffs claim that the placement of these sketches on Defendants' photo booths violates the Lanham Act because it creates confusion as to the "affiliation, connection, or association" of Tom Cruise and Marilyn Monroe with Defendants' booths, and because it constitutes false advertising by implying that the celebrities endorse Defendants' products. Plaintiffs argue that this confusion leads users to utilize Defendants' booths more than Plaintiffs' booths. To support this claim, Plaintiffs hired Dr. Howard to perform a survey to determine the amount of actual confusion engendered

by the pictures of these celebrities on the outside of Defendants' machines.

Dr. Howard's study proceeded as follows: First, he downloaded Defendant Foto Fantasy's statement of demographics of the users of the Portrait Studios. Dr. Howard then "spent three days observing users and potential users of a Portrait Studio" located in Grapevine Mills Mall. Declaration of Dr. Howard ("Declaration") at 2. He observed 30 people using the photo booth and another 120 who expressed interest in using the booth. Dr. Howard then compared the demographics of these people with the demographics given by Foto Fantasy and determined that "the published demographics were approximately accurate." *Id.* He "was also able to further specify the gender breakdown of the 'parents' referred to in the published demographics, and determined they were primarily mothers as opposed to fathers." *Id.*

Dr. Howard next "conducted two focus groups as a first 'pretest' to determine consumer interpretation of the term 'endorses and approves,'" a phrase he planned to use in the survey questions. *Id.* One focus group was composed of adults aged 18–42, and the other of adolescents 13–17. *See id.* The participants in these pretests were people Dr. Howard had found at the SMU Student Center.[1] Defendants' Motion at 6. Dr. Howard found that "[a]dult members agreed that endorsement or approval by Tom Cruise would mean Cruise had developed a business relationship with the Portrait Studio, and adolescent members agreed that it meant he 'probably gets money' from the Portrait Studio." Declaration at 3.

Dr. Howard then conducted a second pretest, in which he presented 30 respondents, half of them aged 13–17 and half of them 18–45, with the materials he would later use in conducting his mall survey, and then "asked the extent to which they agreed or disagreed with two statements." *Id.* The first statement asked, "If Tom Cruise has 'endorsed or approved' the Portrait Studio, it means that he likes the Portrait Studio or believes the Portrait Studio does good·work." *Id.* Seventy-three percent of the respondents "strongly agreed" and the rest "agreed" with the statement. *See id.* The second statement asked, "If Tom Cruise has 'endorsed or approved' the Portrait Studio, it means that he is probably getting money from the Portrait Studio." Forty percent "strongly agreed" with the statement, while about forty-seven percent "agreed." The rest were "unsure" and two "disagreed" with the statement. *See id.* Dr. Howard found "no differences in the level of agreement of adults and adolescents in their responses to either the first or second statement." *Id.* Thus, he concluded from the pretests that "adolescents and adults both interpret the phrase 'endorses or approves' to be indicative of a favorable opinion, as well as an existing business relationship." *Id.*

Dr. Howard then conducted his mall study, or "field experiment." He went to NorthPark Mall and selected 224 consumers for questioning. *See id.* Dr. Howard picked these individuals "to match the demographics of the users of the Portrait Studio published by Foto[ ]Fantasy on its web site, as well as the demographics of users and potential users [he] observed at the Portrait Studio" in Grapevine Mills Mall. *Id.* He divided the group in half, randomly assigning each participant to either the "experimental" or the "control" group. *See id.*

---

1. Defendant argues that this survey universe was inaccurate because it was "almost entirely Anglo," was not randomly selected, and lacked ethnic, economic, and geographic diversity. Defendant's Motion at 6.

After dividing the participants into the experimental and control groups, Dr. Howard gave every group member an envelope that contained the survey materials. *See id.* In order to "avoid any possible contamination of the process," he then stood out of sight while the respondents looked through the materials and answered the questions. *Id.* The only difference between the materials given to the control group and to the experimental group was the inclusion of the Tom Cruise sketch in the experimental group's packet. *See id.* at 5. "Since that would be the only factor that differentiated the two groups, any reliable differences in the answers that the two groups gave to the same questions could only be attributable to their exposure to the Tom Cruise sketch." *Id.* at 4.

Based on the survey results, Dr. Howard concluded that

the Tom Cruise sketch on the outside of the Portrait Studios results in the Portrait Studios being significantly more likely to capture consumers' attention[, and] significantly more likely to arouse the interest of consumers in the Portrait Studio, and [therefore consumers are] significantly more likely to purchase portraits from the Portrait Studio. I am also of the opinion that the sketch of Tom Cruise on the Portrait Studio results in approximately half of the consuming public believing that Tom Cruise endorses or approves of the Portrait Studio. I arrive at this conclusion by deducting the 7.1% of those in the control group who said they believed it likely or very likely that Tom Cruise endorsed or approved of the Portrait Studio from the 56.3% of those in the

experimental group who responded the same way. By deducting the 7.1% from the 56.3%, I conclude that the "net" or "incremental" confusion rate is 49.2%. *Id.* at 6–7.

Defendants complain that Dr. Howard's conclusions are unreliable and should be disregarded by the Court for three reasons. First, in both the pretests and the actual mall survey, Dr. Howard did not utilize a proper survey universe; *i.e.*, his pretest and survey participants did not mirror the actual consumers of Defendants' product. Second, the survey included leading questions that suggested the answer to the participants and resulted in a "demand effect" that skewed the survey data. Last, Dr. Howard's methodology did not reflect actual market conditions, as he only showed the survey participants pictures of the photo booth instead of an actual photo booth.[2]

## II. Proper Survey Universe

Defendants argue that the survey universe of both the pretests and the actual survey was improper:

Dr. Howard did not ... conduct the survey at a location that contains a photo booth, not to mention one owned or operated by any of the Defendants. Dr. Howard chose for his test location an upscale shopping mall in north Dallas that can hardly be said to reflect the consumer population to which his study should have been geared; that is, a population which is likely to encounter and utilize a Portrait Studio owned by Defendants.... In addition, none of Dr.

---

**2.** Defendants further argue that the picture of the photo booth shown to the survey respondents is misleading, as it "is an angled photograph that hides half of the booth, [and was] taken from a distance that makes many of the booth's design elements virtually impossible to identify." Defendant's Motion at 13. De-

fendants also object to the study because the Tom Cruise and Marilyn Monroe sketches were given to the participants along with an accompanying description that named the celebrities, whereas nothing on the photo booths themselves names the celebrities in the sketches. *See id.* at 14.

Howard's pretests included respondents from any relevant consumer population. Instead, Dr. Howard targeted parents and students at Southern Methodist University who had no demonstrable link to the photo booths in question, nor any identifiable characteristics that would suggest those individuals are likely to encounter Defendants' photo booths.

Defendants' Motion at 16–17. On the importance of a proper survey universe, Defendants rely primarily upon *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252 (5th Cir.1980), and *Jaret International, Inc. v. Promotion in Motion, Inc.*, 826 F.Supp. 69, 73–74 (E.D.N.Y.1993). These cases do not assist in proving Defendants' point, however.

Defendants quote *Amstar* for the proposition that "one of the most important factors in assessing the validity of an opinion poll is the adequacy of the 'survey universe,' that is, the persons interviewed must adequately represent the opinions which are relevant to the litigation." *Amstar*, 615 F.2d at 264. Indeed, the *Amstar* court did reject a survey proffered by the plaintiff in that case, who manufactured and sold Domino's Sugar. The plaintiff had introduced the survey to prove that consumers believed Domino's Sugar and Domino's Pizza were made by the same company or were related in some other way. The court rested its decision on the fact that the plaintiff's survey only polled "women found at home during six daylight hours who identified themselves as the member of the household primarily responsible for grocery buying." *Id.* The court found that, "[a]s plaintiff's sugar is sold primarily in grocery stores, participants in the ... survey would have been repeatedly exposed to plaintiff's mark, but would have had little, if any, exposure to defendants' mark. Furthermore, the survey neglected completely defendants' primary customers[:]

young, single, male college students." *Id.* In contrast, Dr. Howard attempted to replicate Defendants' consumer base. The claimed defects in Dr. Howard's survey universe are nothing like the flagrant methodological errors that inhered in the *Amstar* poll.

Defendants do not fairly represent the holding of the court in *Jaret International, Inc. v. Promotion in Motion, Inc.*, 826 F.Supp. 69, 73–74 (E.D.N.Y.1993). In their motion, Defendants contend *Jaret* held that, "[b]ecause the [defendant's] product was not available for sale in the mall where the survey was conducted, ... the survey was inadmissible to show consumer confusion." Defendants' Motion at 16. In reality, the court held the survey to be unreliable because it was conducted in a mall where only the plaintiffs' product was sold, "thereby minimizing the probability that a fair sampling of [the defendants' product's] purchasers was included." *Id.* at 73. The court continued, "[t]his deficiency is even more drastic than in *Amstar.*" *Id.* Contrastingly, Defendants in the case at hand acknowledge that neither Plaintiffs nor Defendants have a photo booth in NorthPark Mall. Therefore, Dr. Howard's study does not fail under *Jaret.*

Thus, the cases cited by Defendants do not support the argument that the Court should disregard Dr. Howard's findings based on his survey universe. Although Dr. Howard could have improved the survey by conducting it at more than one mall, this is not a cause to throw out his findings. In fact, a similar report by Dr. Howard was held to survive a *Daubert* challenge for lack of geographic diversity. *See Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533 (10th Cir.1996). In that case, Harold's Stores retained Dr. Howard to conduct a survey to " 'determine whether, and to what degree, Dillard's sale of Harold's copyrighted fabric

designs inflicted damages to future sales of women's and men's clothing by Harold's.'" *Id.* at 1545. Dr. Howard's entire survey universe consisted of 1,231 female undergraduates at SMU. *See id.* Dillard's objected to the universe of customers surveyed, arguing that it was too narrow. *See id.* The court held, however, that Dr. Howard's testimony and report were admissible, finding that survey evidence should only be excluded "when the sample is clearly not representative of the universe it is intended to reflect." *See id.* at 1544 (internal quotation marks omitted). In contrast, "[t]echnical and methodological deficiencies in the survey, including the sufficiency of the universe sampled, bear on the weight of the evidence, not on the survey's admissibility." *Id.* The situation in *Harolds Stores* is much like the one at hand: In both, Dr. Howard attempted to assemble a survey participant group that conformed to the demographics supplied by Foto Fantasy and to those segments of the population whom he saw using or showing interest in Defendants' Portrait Studio. Although Dr. Howard could have conducted the survey with a larger respondent base, these defects go towards the weight, and not the admissibility, of the evidence.[3]

### III. The Demand Effect

Defendants argue that Dr. Howard's survey questions were leading and therefore tainted the participants' responses. The Court finds that the survey questions were not leading, however, as they did not suggest an answer to the respondents.[4] Defendants urge that even if the questions are not leading *per se*, they still suggest a possible association between Tom Cruise and the Portrait Studios that impermissibly influenced the participants' responses. In this argument, Defendants overlook the fact that Dr. Howard utilized a control group, one of the purposes of which was to monitor any possible demand effect the questions had on the respondents. As one district court found, "[t]he control cell is supposed to 'control' extraneous factors (known as 'noise')." *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.*, 129 F.Supp.2d 351, 365 n. 10 (D.N.J.2000). It further explained that " 'the control cell functions as a baseline and provides a measure of the degree to which respondents are likely to give an answer ... because of other factors, such as the survey's questions, the survey's procedures, ... or some other potential influence on a respondent's answer such as pre-existing beliefs.' " *Id.* (quoting the declaration of the expert who had conducted the survey). On this basis, Plaintiffs argue that, "[t]o the extent that something about the procedure or the questions in Dr. Howard's survey led consumers to see an endorsement where otherwise they might not have, that factor can be eliminated by subtracting the control group result from the test group result," which Dr. Howard purportedly did in determining the "net" confusion rate of 49.2%. Plaintiffs' Response at 18.

The Court finds that the use of the control group could have negated any real effect the form of the questions had on the participants. The fact that about 7% of the control group found it likely or very likely that Tom Cruise endorsed Defen-

---

3. The Court has serious questions about the methodology employed in the pretests; however, the pretests are of marginal relevance to the issue, since the Court will focus on the survey. Therefore, the Court declines at this juncture to strike the pretests under application of *Daubert* principles.

4. Dr. Howard asked, among other things, "How likely or unlikely is it that Tom Cruise has endorsed, or approves of, the Portrait Studio?" The participants could choose from the following answers: very likely, likely, unsure, unlikely, and very unlikely.

dants' Portrait Studios does suggest that something about the questions, the form of the survey, or something in the participants' background beliefs influenced them to find a relationship between the two even though they were not shown a picture of the Tom Cruise sketch that hangs outside Defendants' photo booths. Dr. Howard's subtracting of the 7.1% attributable to "noise" in arriving at his net estimation of confusion addresses this problem so that it does not present a reason for the Court to strike Dr. Howard's report and disregard his testimony.

## IV. Market Conditions

█ Defendants last argue that Dr. Howard's report fails to accurately reflect market conditions because (a) the survey participants were presented with an allegedly misleading picture of the Portrait Studio instead of with the actual Portrait Studio itself; (b) Tom Cruise's portrait was "presented front-and-center in the survey," which likely "exaggerat[ed] the presence of Mr. Cruise's image on the photo booth;" and (c) the sketches of Tom Cruise and Marilyn Monroe were identified as being Cruise and Monroe in the materials Dr. Howard handed out to the survey participants. Defendants' Motion at 13–14. Although it is clear from Dr. Howard's description of his experiment that it did not mirror actual market conditions in every possible way, Dr. Howard attempted, in his materials, to explain to the participants the mindset they should have in evaluating Defendants' photo booths. For example, the instructions to the questions told participants, "[w]hen answering these questions, assume that you were walking by a Portrait Studio." App. to Plaintiffs' Response at 40. Dr. Howard also attempted to explain to the participants how the pictures of Tom Cruise and Marilyn Monroe fit into the overall design of the photo booths, stating that "[t]his 8½ × 11 sketch is displayed on the outside of

the Studio as an example of the Studio's work." See, e.g., id. at 46.

Additionally, the picture of the photo booth submitted to the respondents along with the questionnaire does not appear to the Court to distort the machine, and was clear enough to allow the participants to understand how the pictures of Tom Cruise and Marilyn Monroe were affixed to the outside of the booth. Thus, the Court concludes that this part of the survey was not sufficiently misleading to require the Court to disregard Dr. Howard's survey results altogether.

Defendants' arguments that Dr. Howard impermissibly identified Tom Cruise and Marilyn Monroe are also inapposite. First, Defendants presumably picked pictures of Tom Cruise and Marilyn Monroe to be examples of the Portrait Studio's sketching capability because of their notoriety, as the sketches are used to promote the photo booth's capability of sketching celebrity pictures. It is strange, then, that Defendants are now arguing that many of the respondents would not have recognized Cruise and Monroe from their sketches if Dr. Howard had not identified the celebrities by name. In any event, the Court finds that Dr. Howard did not render the survey inadmissible by stating the celebrities' names in the survey materials. The Court will keep in mind when evaluating Dr. Howard's survey results that the findings only represent the opinions of those participants who know that the sketches are of Tom Cruise and Marilyn Monroe. Therefore, the fact that Cruise and Monroe were identified by name in the survey is not a sufficiently strong justification for this Court to disregard Dr. Howard's report altogether.

In conclusion, the Court finds that Defendants' criticism of Dr. Howard's survey methodology, although it may be persuasive, goes only to the weight, and not the

admissibility, of the evidence. Therefore, Defendants' Motion to Strike Dr. Howard's expert report and trial testimony is DENIED.

SO ORDERED.